**Richmond.**

CHAPPELL v. TRENT.

DECEMBER 7th, 1893.

| 90 | 849 |
|-----|-----|
| 101 | 512 |

| 90 | 849 |
|-----|-----|
| 108 | 708 |

1. WILLS—*Capacity—Undue influence—Instructions.*—It is error in a suit to set aside a will for testamentary incapacity and undue influence, to refuse an instruction asserting that undue influence is any means employed with the testator, which, under the circumstances, he cannot well resist and which induces him to do what otherwise he would not do.

2. IDEM—*Misleading.*—An instruction that the influence to vitiate a will must amount to force and coercion obstructing free agency, and not the mere influence of affection and attachment nor mere desire of gratifying another's wishes, is misleading as being calculated to impress the jury that only physical force or threats of personal violence would be sufficient to vitiate a will, and is erroneous.

3. IDEM—*Assumption of facts.*—It is error to give an instruction ignoring the question of testamentary capacity, and thus assuming its existence, and suggesting that unless it be shown that the will was the result of irresistible importunities, or was made purely for the sake of peace, it must be upheld.

4. IDEM—*Previous declarations.*—An instruction assuming that the provisions of a will accord with testator's affections and previous declarations is erroneous where it devises all of testator's property to persons not related to him, and is contrary to his previous declarations to the effect that he did not intend to make any will, and he is not shown to have had any affection for such beneficiaries.

5. IDEM—*Burden of proof.*—Beneficiaries, no kin to a testator eighty-five years old, of greatly impaired health and enfeebled mind, and in their custody, and away from his next of kin, and induced by them or his attending physician to devise to them his entire estate, have the burden of clearly proving that the will was his free and voluntary act.

6. WILLS—*Evidence of testamentary capacity.*—That a testator had sufficient mind to answer ordinary questions is not evidence of testamentary capacity if he did not have sufficient active memory to collect in his mind, with-

out prompting, particulars of the business to be transacted and to hold them in his mind a sufficient length of time to perceive at least their obvious relations to each other and to be able to form some rational judgment in relation to them.

7. IDEM—*Opinion of subscribing witnesses.*—The mere statement of subscribing witnesses that testator knew what he was doing is not sufficient proof of testator's capacity to entitle the will to be proved, where the proof shows that in fact he did not recognize either of them upon their coming into his room, and that no word passed between them, and that to all appearances testator was unconscious of their presence.

8. IDEM—*Opinion of attending physician.*—Testamentary capacity is not established by the opinion of the attending physician alone that testator was mentally competent when he executed the will, where there are numerous facts at and before its execution tending to show the contrary, and such physician's testimony is itself inconsistent, and he states that he is in doubt as to what constitutes mental competency, and would rather state the circumstances, and such circumstances as stated by him indicate lack of a sound disposing mind and memory.

9. IDEM—*Testing capacity.*—A will will be set aside as having been obtained by undue influence where, at the time of its execution, the testator was weak, feeble, and nearly unconscious, and it was more the will of his attending physician who drew it, and urged its execution, than of testator, and who wholly omitted his duty of testing testator's mental capacity before taking part in procuring its execution.

10. IDEM—*Verdicts.*—A verdict sustaining a will will be set aside where facts and circumstances before and at time of executing the will clearly show want of testamentary capacity, and that the will was not the testator's free and voluntary act, and the verdict can be accounted for only on the ground of reliance upon instructions clearly erroneous.

11. IDEM—*Presence of subscribing witnesses.*—The presence of the subscribing witnesses required by the statute is a presence of which testator is conscious, and not that they be merely present together and that testator is looking straight at them, where he does not recognize them, and, instead of his requesting them to attest his will, or their asking him if he desires them to do so, he appears utterly unconscious of their presence.

12. IDEM—*Signature of testator.*—An instruction that a will is invalid unless in writing and signed by the testator, or by some other person in his presence and by his direction, in such manner as to manifest that the name is intended as a signature, and unless it be wholly written by the testator, the signature must be made or the will acknowledged by him in the presence of at least two competent witnesses present at the same time, and such witnesses must subscribe the will in testator's presence,

is in accordance with the statute and covers the whole ground, and any addition to the effect that such direction need not be in any particular form, but may be given by testator spontaneously or at the suggestion of another, should not be given.

13. IDEM—*Case at bar.*—In case here after minute consideration of the facts attending the execution of the paper and of the testimony of one of the beneficiaries and of the subscribing witnesses, *held,* there was a failure to prove that testator was at the time possessed of a sound mind and disposing memory, and that therefore said paper was not his true last will and testament.

Appeal from circuit court of Bedford county, rendered in a cause wherein Josiah Chappell and many others, the heirs-at-law of Richard T. Chappell, deceased, were complainants, and Elizabeth Mc. Trent and Edward T. Trent were defendants. The purpose of the suit was to annul the alleged will of the decedent. At the trial of the issue of *devisavit vel non* the jury brought in a verdict sustaining the will, and the complainants, (defendants in said issue) moved for a new trial, which being denied and a decree entered in accordance with the verdict, the said complainants appealed. Opinion states the case.

*James G. Field, Kirkpatrick & Blackford,* and *John M. Payne,* for appellants.

*R. G. H. Kean* and *M. P. Burks,* for appellees.

RICHARDSON, J., delivered the opinion of the court.

The object of this suit was to annul and set aside as invalid a certain paper writing executed on the 17th day of June, 1890, and purporting to be the last will and testament of the said Richard T. Chappell, which paper had been admitted to probate, *ex parte,* by the county court of Bedford county at the July term thereof, 1890.

The circuit court of Bedford made an order in the cause, directing an issue *devisavit vel non* to be tried at its bar, in

which the defendants, Edward Trent and Eliza Trent, should be plaintiffs, and the plaintiffs in the cause should be defendants. The cause came on and the issue was tried at a special term of the circuit court of Bedford county, continued and held for said county, on the 1st day of September, 1890, when the jury found the following verdict: " We, the jury, find that the paper writing in the bill and proceedings mentioned, dated the 17th day of June, 1890, purporting to have been signed by Richard T. Chappell, by T. W. Nelson, and attested by Charles H. Terrell and Joseph M. Crank, which was admitted to probate *ex parte* in the county court of Bedford county on the 28th day of July, 1890, as the will of Richard T. Chappell, deceased, and every part thereof is the will of Richard T. Chappell, deceased."

Whereupon the defendants in the issue moved the court to set aside the verdict of the jury and grant them a new trial upon the ground that the verdict of the jury was against the law and the evidence; but the court overruled the motion and refused to grant a new trial; to which ruling of the court the defendants, by counsel, excepted; and the court certified the evidence adduced at the trial.

On the trial of said issue, and after all the evidence had been introduced, the defendants in the issue moved the court to give to the jury two instructions, designated as instructions C and D, respectively, as follows:

### Instruction C.

" That 'undue influence' is any means employed upon and with the testator by which, under the circumstances and conditions by which the testator was surrounded; he could not well resist, and which controlled his volition and induced him to do what otherwise would not have been done."

### · Instruction D.

" When an old man eighty-five years old, of greatly impaired health and enfeebled mind, away from his next of kin and in the custody of persons of no kin, is induced to make a will giving to such persons his entire estate, the law requires that such persons must clearly prove that the said will was the free and voluntary act of the testator and an intelligent expression of his wishes respecting the disposition of his property."

But to the giving of these instructions the plaintiffs in the issue objected, and, by counsel, in lieu thereof, asked for two other instructions, marked, respectively, 6 and 7, which objection the court sustained and gave said instructions 6 and 7, as follows:

### Instruction 6.

" The question as to what is undue influence such as to overcome the will or control the judgment of the testator, largely depends upon the circumstances of each case, chief of which are the dispositions contained in the will, the situation of the testator, and his mental and physical condition at the time the will was made.

"Influence to vitiate an act must amount to force and coercion, obstructing free agency; it must not be the influence of affection and attachment; it must not be the mere desire of gratifying the wishes of another that might be a very strong ground in support of the testamentary act.

"Further : there must be proof that the act was obtained by this coercion, by importunity that could not be resisted; that it was done merely for the sake of peace, so that the motive was tantamount to force or fear.

" On the other hand, where the provisions of the will accord with the affections and previous declarations of the testator, and are such as might have been justly expected, these are

facts tending to prove both testamentary capacity and freedom of action."

### Instruction 7.

" When a testator of great age and impaired health by his will gives his property to persons who are immediately about· him, to the exclusion of his kindred, it is the duty of the jury to look closely into the question whether such disposition was free and intelligent, to consider what previous declaration of his purpose (if any) he may have made, his relations and feel- ings towards his kindred and towards the beneficiaries under the alleged will, and to inquire whether, under all the circum- stances of the case, the disposition made is such as might naturally have been expected, and such as the common sense of men would naturally expect.

"If, in such case, relations are disinherited who would natu- rally have been expected to be the objects of the testator's bounty, in favor of persons in whose favor, under the circum- stances, such a disposition would not have been anticipated, they should very clearly show that the will was the free and voluntary act of the testator."

And thereupon the defendants in the issue offered in lieu of said instruction No. 6, given by the court, the following in- struction, marked E :

### Instruction E.

" The court instructs the jury that to make a good will a man must be a free agent, but all influences are not unlawful; ap- peals to the affections or ties of kindred, to gratitude for past services or pity for future destitution, or the like, are all legiti- mate, and may be fairly urged on a testator. On the other hand, pressure of whatever character, if so exerted as to over- power the volition without convincing the judgment, is a spe-

cies of restraint under which no valid will can be made. Importunity which the testator has not the will or strength to resist, and to which he yields for peace and quiet if carried to a degree in which the testator's judgment, discretion, or wish will constitute undue influence, though no force is used or threatened. In other words, his will must be the offspring of his own volition, and not the record of the wishes and desires of some one else, and in considering whether the testator's free volition had been overborne or controlled, the jury must consider his age, his physical and mental condition, and all the circumstances surrounding the testator."

But the court overruled the motion and refused to give said instruction E in lieu of said instruction 6, given at the instance of the plaintiffs in the issue; to which action of the court refusing instructions C, D, and E, and giving said instructions 6 and 7, the defendants in the issue, by their counsel, excepted; and the said rulings of the court with respect to said instructions constitute the subject of the defendants' bill of exceptions No. 1.

And further, upon the trial of the issue, and after all the evidence had been introduced, the defendants in the issue moved the court to give the following instruction, designated

### Instruction No. 1.

"The court instructs the jury that no will is valid unless in writing and signed by the testator, or by some other person in his presence and by his direction, in such manner as to make it manifest that the name is intended as a signature, and more-over, unless it be wholly written by the testator, the signature must be made or the will acknowledged by him in the presence of at least two competent witnesses present at the same time, and such witnesses shall subscribe the will in the presence of the testator."

But on the motion of the plaintiffs in the issue, by their

counsel, the court added to the instruction so asked for, the following:

"If a will has been signed by some other person in the presence of the testator, and by his direction, it is not required that such direction be in any particular form. It may be by the spontaneous direction of the testator, or by the suggestion of a third person accepted and adopted by the testator."

To this addition to the instruction, as asked for by them, the defendants in the issue objected, but the court overruled their objection and made the addition to the instruction as asked for by the plaintiffs in the issue; to which action of the court the defendants in the issue excepted; and this is the subject of their bill of exceptions No. 2.

As already stated, the jury returned a verdict sustaining the alleged will; and the defendants in the issue, by counsel, moved the court to set aside the verdict of the jury and grant them a new trial, upon the ground that the verdict was against the law and the evidence in the case; but the court overruled the motion and refused to grant a new trial, and thereupon proceeded to enter its decree in accordance with the finding of the jury; to which action of the court the defendants in the issue, by their counsel, also excepted, and the court certified, not the facts, but all the evidence; and this is the defendant's [in the issue] bill of exceptions No. 3. From the decree so rendered, the case is here on appeal.

The main question in the case is one of testamentary capacity. In other words, the question to be decided is, Was the alleged testator, Richard T. Chappell, at the time of the execution of the writing purporting to be his last will and testament, capable of making a valid will disposing of his property?

The statute, § 3, ch. 118, Code 1873, provides that "no person of unsound mind or under the age of twenty-one years, shall be capable of making a will, except that minors eighteen years of age or upwards may, by will, dispose of personal

estate; nor shall a married woman be capable of making a will, except for the disposition of her separate estate, or in the exercise of a power of appointment." And as to the mode of executing wills, it is provided by section 4 of the same chapter, that "no will shall be valid unless it be in writing and signed by the testator, or by some other person in his presence or by his direction, in such manner as to make it manifest that the name is intended as a signature; and, moreovor, unless it be wholly written by the testator, the signature shall be made or the will acknowledged by him in the presence of at least two competent witnesses present at the same time; and such witnesses shall subscribe the will in the presence of the testator, but no form of attestation shall be necessary.

This case is so remarkably like the case of *Tucker* v. *Sandadge, Curator*, 85 Va. 546, that it may be said with safety to be, in every essential particular, ruled by that case; and, upon the important question of testamentary capacity, we cannot do better than to reproduce here the authorities cited in that case, as follows:

"In the *Marquis of Winchester Case* it is said that 'by law it is not sufficient that the testator be of memory, when he makes his will, to answer familiar and usual questions; but.he ought to have a disposing memory, so that he is able to make a disposition of his lands with understanding and reason, and that is such a memory. which the law calls sound and perfect memory.'

"In *Mountain* v. *Bennett*, 1 Cov., 353, the Lord Chief Baron said: 'Two things must be made out, in the first instance, by those who support the will—the formality of the instrument and the sanity of the person making it; that if a party impeaching a will relies upon actual force being used upon the testator, it is incumbent on him to show it,' and he adds that 'there is another ground which, though not so distinct as actual force nor so easy to be proved, yet if it should be made out would certainly destroy the will; that is, if a dominion

was acquired by any person over a mind of sufficient sanity to general purposes, and of sufficient soundness and discretion to regulate his affairs in general; yet, if such dominion or influence were acquired over him as to prevent the exercise of such discretion, it would be equally inconsistent with the idea of a disposing mind.'

"In *Marsh* v. *Terrell*, 2 Hagg., 122, that experienced and learned judge, Sir John Nicholl, said : ' It is a great but not uncommon error to suppose that, because a person can understand a question put to him, and can give a rational answer to such question, he is of perfect sound mind, and is capable of making a will for any purpose whatever; whereas, the rule of law, and it is the rule of common sense, *is far otherwise;* the competency of the mind is to be judged by the nature of the act to be done, from a consideration of all the circumstances of the case.'

" The observations of Erskine, J., in *Harwood* v. *Baker*, 3 Moore Priv. C. C., 282–290, *   *   * are worthy of note. He says : ' But their lordships are of opinion that, in order to constitute a sound disposing mind, a testator must not only be able to understand that he is, by his will, giving the whole of his property to one object of his regard, but that he must also have capacity to comprehend the extent of his property, and the nature of the claims of others, whom, by his will, he is excluding from all participation in that property ' ; and he justly and truthfully adds, ' that the protection of the law is in no case more needed than it is in those where the mind has become too much enfeebled to comprehend more objects than one, and most especially when that object may be so forced upon the attention of the invalid as to shut out all others that might require consideration ; and therefore the question which their lordships propose to decide in this case is not whether Mr. Baker knew when he was giving all his property to his wife and excluding all his other relations from any share in it, but whether he was at that time capable of recollecting who those relations were,

of understanding their respective claims upon his regard and bounty, and of deliberately forming an intelligent purpose of excluding them from any share of his property.'

"In *Derr* v. *Jackson*, 2 Southard's R., 454, the chief justice, in charging the jury on this point, said, ' that a disposing mind and memory is a mind and memory which has the capacity of recollecting, discerning, and feeling the relations, connections, and obligations of family and blood; that, though it has some-times been said, as had been stated from the books, that if one could tell his name, say the day of the week, or even ask for food, it is a sufficient evidence of a disposing mind; yet such sayings, though they show that wills are not rightly to be set aside on suggestions of incapacity, can and ought to have but little weight with rational men, investigating the truth upon their oaths; that if, upon the whole, they should be of opinion that the mental powers of the testatrix were so far enfeebled and broken as that she could not make a discreet disposition of her affairs herself, and the will in question was devised by other persons, and only assented to by her, upon being asked, without the power of understanding it, then they ought to find for the plaintiff; that is, that it was not her will.' * * *

"In *Shropeshire* v. *Reno*, 5 J. J. Marsh., 91, Robertson, C. J., observed that the facts in that case led to the conclusion ' that the testator had not a disposing mind, or that if he ever had, it was not in a disposing state. He was not superanuated, nor was he absolutely *stultus* or *fatuus;* but all the facts combined tend to show that he had not a *sound memory*, was sufficient mind, nor a mind in a proper state for disposing of his estate with reason, or according to any fixed judgment or settled pur-pose of his own. This we consider the true test, established not only by philosophy, but by law.

" *Converse* v. *Converse*, 21 Verm. R., 168, lays down the rule, that if ' the testator, when he made the will, was capable of knowing and understanding the nature of the business he was then engaged in, and the elements of which the will was com-

posed, and the disposition of his property as therein provided for, both as to the property he meant to dispose of by his will and the persons to whom he meant to convey it, and the manner in which it was to be distributed between them, then he possessed a sound and disposing mind and memory.' This rule was approved by Redfield, J., who added: ' He must undoubtedly retain sufficient *active memory* to collect in his mind, without prompting, particulars or elements of the business to be transacted, and to hold them in his mind a sufficient length of time to perceive at least their obvious relations to each other, and be able to form some rational judgment in relation to them.'

"In 1828, Chancellor Walworth, in *Clarke* v. *Fisher*, 1 Paige, 171, said: 'The general principles in relation to the capacity of a person to make a will are well understood. He must be of sound and discerning mind and memory, so as to be capable of making a testamentary disposition of his property with sense and judgment in reference to the situation and amount of such property, and to the relative claims of different persons who are or might be the objects of his bounty. In that case the chancellor reversed the decision of the surrogate, which admitted the will of John Fisher to probate. The testamentary capacity of John Fisher was again the subject of judicial investigation before Vice-Chancellor Sandford, in 1845 and 1846 (3 Sand. Ch. R., 351), and he held that he had testamentary capacity. But, on appeal, that decision was reversed by the chancellor, who held the will void, and the chancellor's decree was, on appeal, affirmed by the New York Court of Appeals.' 2 Cor. R., 498."

The cases above referred to were decided by courts of very high authority; and they state with clearness and accuracy the true principles to be applied in determining the question of testamentary capacity. And, as was said in *Tucker* v. *Sandridge, Curator*, 85 Va., 546, they do not attempt, on the one hand, the difficult, if not impossible, task of laying down any precise rule as to the exact amount of mental capacity essen-

tial to a valid will, and, on the other hand, they carefully avoid
that other and perhaps more dangerous doctrine, which has
sometimes been held, that any degree of mental capacity above
that of the idiot and the lunatic is sufficient; but, appealing
to unfettered human reason as the only safe guide to rational
and just testatorial conclusions and actions, they do prescribe
the only sensible, judicious, and safe rule for the guidance of
the courts.    They announce the simple, common-sense doc-
trine that, in order to execute a valid will, the alleged testator
must be shown to have, at the time of making it, sufficient
*active memory* to recall his family and his property, and to form
some rational judgment in regard to the claims of the one and
the disposition of the other, with reference to the claims of
family and blood.    In other words, as was said by Redfield, J.,
it must appear that the testator, when he made his will, " was
capable of knowing and understanding the nature of the busi-
ness he was then engaged in, and the elements of which the
will was composed, and the disposition of his property, as
therein provided for, both as to the property he meant to dis-
pose of by his will, and the persons to whom he meant to con-
vey it, and the manner in which it was to be distributed among
them."

In the light of the principles above stated, the question is,
Was the alleged testator, Richard T. Chappell, at the time of
the execution of the paper in question, purporting to be his
last will and testament, possessed of testamentary capacity to
make a valid will?

Our statute of wills declares that " no person of unsound
mind or under the age of twenty-one years shall be capable of
making a will, except that minors eighteen years of age or up-
wards may, by will, dispose of personal estate; nor shall a
married woman be capable of making a will, except for the
disposition of her separate estate, or in the exercise of a power
of appointment."    Code 1887, § 2513.    And as to the mode
of executing a will, it is declared that " No will shall be valid

unless it be in writing and signed by the testator, or by some other person in his presence, and by his direction, in such manner as to make it manifest that the name is intended as a signature; and moreover, unless it be wholly written by the testator, the signature shall be made or the will acknowledged by him in the presence of at least two competent witnesses, present at the same time; and such witnesses shall subscribe the will in the presence of the testator, but no form of attestation shall be necessary." *Ib.*, § 2514.

Before proceeding to examine the testimony bearing directly on the question of testamentary capacity, it is important to call attention to the circumstances immediately preceding and attendant upon the execution of the paper in question, and to give a brief sketch of the life, habits, and character of the alleged testator, as disclosed by the record.

The will is very brief, and is shown to have been written with unbecoming haste and without any, or the opportunity of any, deliberate forethought, on the part of the alleged testator, and without any precaution on the part of either the draftsman of the paper or the attesting witnesses to ascertain whether, at the time, the alleged testator was possessed of sufficient mental capacity to make a valid will.

It unmistakably appears that Mr. Chappell was averse to making any will; that he, with one exception, presently to be mentioned, uniformly, for many years prior to the execution of the paper in question, when approached on the subject by his neighbors and friends, declared either that " the law makes the best will," or that " the law makes a good enough will for me." On the one occasion referred to, at the suggestion of Mr. Elam, an acquaintance and friend, he agreed to provide for his brother, the appellant, Josiah Chappell, for his life, and solicited Mr. Elam's aid in arranging the matter; but this agreement was never carried into effect.

Never, on any other occasion, did he say or do anything evincing any serious purpose on his part to make any will,

much less a will giving to Eliza and Ned Trent his entire
estate, to the utter exclusion of his family and blood. Indeed,
Mr. Elam testifies that he, on the occasion above mentioned,
said to Mr. Chappell that he (Elam) had heard that he (Chap-
pell) intended to give his estate to the Trents; and that Mr.
Chappell indignantly denied the truth of the report, and hooted
at the idea of his giving the Trents anything.

The so-called will was wholly written, including the signa-
ture, by Dr. T. W. Nelson, the attending physician, and was
attested by Charles H. Terrell and Joseph M. Crank, both of
them brothers-in-law of the beneficiaries (Eliza and Ned Trent).
The alleged will is as follows:

"I, Richard T. Chappell, being of sound mind but extremely
feeble of body, do make and ordain this to be my last will and
testament. I give to Eliza Mc. Trent and E. T. Trent, now
living in my house, all the property of whatsoever kind I die
possessed after the payment of my just debts.

"Given under my hand and seal this 17th day of June, 1890.

"R. T. CHAPPELL, [SEAL.]
"*By T. W. Nelson.*
"Witnessed by Charles H. Terrell and Joseph M. Crank."

Mr. Chappell died the owner of an estate estimated at near
$20,000 in value. He left surviving him, as his next of kin
and heirs at law, a brother of the full blood, the appellant, Jo-
siah Chappell, of Abingdon, Va., and the numerous descend-
ants of two older half sisters, who, a great many years ago,
married and moved South, and whose descendants are very
much scattered.

Mr. Chappell died of an acute, painful, and rapidly exhaust-
ing attack of dysentery, after an illness of about three weeks,
and was, at the time of his death, over eighty-five years of age.
Up to within three hours before the execution of the paper in
question, he never said or did anything that could be tortured

into evincing any purpose on his part to make any such will as that here in question, or any will whatever, except on the occasion referred to, when he. agreed, at the instance of Mr. Elam, to make a life provision for his brother, the appellant, Josiah Chappell; and never, until the day of the execution of this pretended will, and within three hours before its execution, did he declare any purpose to make a will providing for the Trents in any way, and then only, according to the testimony of Ned Trent, one of the beneficiaries, to make *some provision* for said beneficiaries—not a will giving them his entire estate.

Ned Trent's statement is as follows:

Q. "Tell the jury what Mr. Chappell said when he requested you to send for Dr. Nelson."

A. "Went into room after dinner to keep the flies off him as usual after eating a meal, and he said to me five or ten minutes after—not longer than ten minutes after—that it was a very hard thing to be so low and know that you would never get well. I told him that it was, and we must all live in hope, and he paused, I supposed, for two or three minutes before he said anything more, and he asked me when would Dr. Nelson be back. I said late this evening or early in the morning. That is what he said. He said then that 'you and Eliza have been very kind to me all your lives and waited on me in sickness and in health, and I want to make some provision for you and Eliza, and wish that Dr. Nelson was here now.' Then I said, 'Do you want him sent for to fix it for you?' and he said, 'Yes, send for him now.' There was no one in the room except I and Mr. Chappell. I wrote a note to Dr. Nelson and sent it by one of the hands that worked on the place, Alfred Fowler. Dr. Nelson arrived, I suppose, in some hour and a half—not longer than two hours. I met Dr. Nelson in the yard and invited him into the house, and told him what Mr. Chappell had said to me. I then went into Mr. Chappell's room with Dr. Nelson. Mr. Chappell was asleep when Dr.

Nelson went into the room. He took a seat and waited ten or fifteen minutes—not longer. than that—and Mr. Chappell awoke. Dr. Nelson asked him how he was, and he said 'tolerably,' as he always did, and asked the Doctor how he was. Then Dr. Nelson stood for a minute or so, and then said to him: 'Mr. Chappell, I have come to do that writing I was sent for to do, and I am at your service to do anything that you wish.' Mr. Chappell looked up at the Doctor, but did not give him any answer, and then the Doctor said to him: 'Do you wish to make a deed by which you will give these people a part of your estate?' He shook his head and said 'No.'"

Q. "Did he simply shake his head, or say no?"

A. "He said no. Then he said, ' do you wish to assign some of the certificates of deposit that you have,' and he shook his head that time, and said no word."

Q. "Did you hear any words?"

A. "No, sir."

And then, says Ned Trent, Dr. Nelson said: "Shall I make a will and give these people your estate, and if it is God's pleasure to restore you, you can amend or destroy or do anything you please with it, and Mr. Chappell said in distinct words, 'That would be better'"; and upon this, and this only, Dr. Nelson sat down and wrote the paper in question as the last will and testament of Mr. Chappell, the whole scheme having originated in the mind of Dr. Nelson, and was, by him, suggested to this extremely aged, diseased, feeble, and dying man; and was thus, as the books say, more the will of Dr. Nelson than of Mr. Chappell. Now, conceding, as we may for the purposes of this case, the entire truthfulness of Ned Trent's relation of the conversation between Mr. Chappell and himself immediately before Dr. Nelson was sent for, it must be admitted that the conversation, thus given in minute detail, indicated calmness and deliberation on Mr. Chappell's part, and strongly tends to show that he was, at that time, possessed of sufficient mental capacity to enable him to make a valid will. But when we come

to look into what occurred after Dr. Nelson's arrival at Mr. Chappell's bedside, we find in Mr. Chappell quite a different man; we find him, evidently, entirely oblivious and unconscious of the fact that he had, less than two hours before, said to Ned Trent that he desired to make *some provision* for him and Eliza, and had directed Dr. Nelson to be sent for to fix the matter. There is no escape from the fact, and its consequences, that Mr. Chappell, on the arrival of Dr. Nelson, and throughout the time of writing and executing this pretended will, retained no active memory of the previous conversation, as related by Ned Trent, in which he directed Dr. Nelson to be sent for to do the necessary writing. For when Dr. Nelson had arrived, had exchanged the usual salutations, and said, " Mr. Chappell, I have come to do the writing I was sent for to do," &c., Mr. Chappell, instead of recognizing the fact that he had directed the Dr. to be sent for, and explaining his object in so doing, and directing Dr. Nelson what to do, simply looked up, as if in a state of wonder and amazement as to what Dr. Nelson meant, and made no answer whatever; and then Dr. Nelson said to Mr. Chappell, " Do you wish to make a deed giving Ned and Eliza Trent part of your estate," and Mr. Chappell said " No." This was quickly followed by Dr. Nelson asking, " Do you wish to assign some of the certificates of deposit that you have," to which Mr. Chappell responded by a shake of the head, but without uttering a word. Both of these suggestions being negatived, Dr. Nelson made the monstrous suggestion : " Shall *I* make a will and give these people your estate, and if it is God's pleasure to restore you you can amend or destroy or do anything you please with it," to which Mr. Chappell responded, " That would be better."

Such is the statement of Ned Trent, one of the beneficiaries—a statement materially different from that of Dr. Nelson on the same subject, as will be shown when we come to examine his testimony. But let it be conceded, for the sake of the argument, that at the time of the execution of the pretended

will, Mr. Chappell retained a feeble gleam of intellect, or was half conscious of what was then going on (and in the light of all the circumstances, no greater concession can reasonably be made), yet, according to Ned Trent's own statement, so far from there being anything to show that the paper in question was the offspring of the mind of a free and capable testator, the facts and circumstances conclusively show that the alleged testator, Richard T. Chappell, was but a passive instrument in the hands of Dr. Nelson, by whose urgent importunities this so-called will in favor of the Trents was procured.

Mr. Chappell lived and died a bachelor, having never been married, and was in some respects a very peculiar man. He was extremely reticent about his affairs and about those of his family, and in his dealings, though said to be strictly honest, was close and stingy to a degree approximating miserly meanness. He was born in Charlotte county, Va., and in early manhood moved to and took possession of his estate in Bedford county, on which he died, and which had been derived from his father. Not very long after taking possession of his estate, he had a difficulty with his overseer, a man named Oglesby, and beat him so severely with rocks that he was sued and had to pay $3,000 damages. After this he seems to have abandoned his estate in Bedford, and returned to Charlotte county, the place of his birth, and where his brother Josiah and his mother lived, and thenceforth his career is outlined in the uncontradicted testimony of his brother Josiah as follows :

"After the death of our father, he [Richard] being that much [four years] older than I was, we both lived together with our mother until he became twenty-one; he went up then to Bedford to live on the plantation, and took possession of it, and whilst he was there he had a falling out with his overseer, Mr. Oglesby, and in falling out he some way or other beat him very severely—struck him with rocks, as I heard; but any way, he had to pay $3,000 for it. He then left this county, and he came to Charlotte and rambled about day and night, calling

at different houses at all hours of the day and night, and he would make threats sometimes against my mother, and perhaps against others, and the people became uneasy for fear he would kill somebody; he showed so much temper that the magistrate had him taken up, and ordered him to be sent to the asylum, and his estate being sufficient, they concluded to send him to a private asylum in Philadelphia, and there he remained, I think, at least two years, if not longer; he managed by some means or other to get out of the asylum, and came home—walked home mainly; I do not suppose he had any money or means; he got home, and the people were in favor of his being sent back. I was a partner with a man in mercantile business by the name of Fuqua, and we agreed to take him in the store and see if we could not manage him and get people satisfied with him. He went and lived in the store, and stayed there two or three years, and it was not very long before people became satisfied that there was no danger, and they gave up all idea of sending him back. Fuqua failed, and after his failure my brother came to my house and lived, and stayed there for years. Before this time, however, he had taken his estate; he told me that he wanted me to attend to it and manage it for him; to go up and see how everything was going on. I did so, and continued to do so until he finally came to the conclusion to go up and attend to it himself."

Then, after stating that during his brother's mental malady he was his committee, and, as such, made annual settlements, the witness (Josiah Chappell) proceeds to make this further statement: "That after his brother took his estate into his own hands, he went on managing, and finally he got this man Trent as overseer," (meaning Edward Trent, Sr., the father of Edward and Eliza, the beneficiaries under the will in question). "I think he had some others before that, but it was not long before he got Trent overseer for him. I used to go up at least once a year, and stayed with him right smart—week or fortnight and a month sometimes—and the Trents at one time

sort of fell out with me for coming and staying so long, and he (meaning his brother) then fell out with them or told them that they had no right to interfere with us. I proposed to him then that if he chose it, I would attend to his business myself; that I had at that time to go into bankruptcy and be deprived of what I had; that I would attend to the business. No, he said, you are not able to undergo all the necessary fatigue and exposure to attend to the business as it ought to be; so I gave it out, and Trent continued to attend, and every once in a year, and sometimes oftener, I would go and see him and stay a week or fortnight; if I was away a year I would stay longer. I could see every time that the Trents were opposed to me coming; they disliked me having any intercourse with him; at any rate, they showed a great deal of prejudice towards me sometimes, not in language, but in their behavior towards me; so I became more neglectful in coming up. I found that I could not get along that way; they were complaining they had to furnish me with a bed and such as that to sleep in; he (meaning his brother) had no furniture in the house except an old sort of trunk; they had all the balance; consequently they furnished the bed and they complained. I thought from the fact that their friends and persons coming there and staying a good long while without complaint that it was prejudice from some cause or other."

Then these questions were asked the witness:

Q. " It has been stated here by Mr. Elam that Mrs. Trent said that the last time you were there you did not stay as long as you had expected to stay when you came, and that on the morning you left Mr. Chappell had directed that you should not be invited to breakfast."

A. " My brother did not tell me that; he denied everything of the kind; but they failed to invite me to breakfast and failed to give me water to wash my face and hands and a towel to wipe on; I thought it best to be going. I discovered be-

fore that that they were very much opposed to me staying, and that was the next thing to ordering me out."          *          *          *

Q. " The question I want to know .is, Did you have any reason to understand or suppose that your brother wanted you at that time to go ? "

A. " No, sir, none ; he did not show any disposition that way ; the only disposition shown to me to go was by the Trents."

Q. "Did you see your brother and tell him you were going ? "

A. " Yes, sir ; he was willing for me to stay ; after that I very seldom offered to go and see him ; I was not able to go ; I had not the money to pay my expenses nor horse hire." * *

Q. " What assistance did you give, if any, in working upon the place whilst you were living or staying at your brother's place when there on a visit ? "

A. " I mauled rails, cut down trees, worked in the cornfield, and split wood for the Trents to cook with ; sometimes I sawed it, too ; attended to the stock, cows, and things of that sort, working on different parts of the farm, and putting up fences."

· This last statement is not only not contradicted, but is fully corroborated by the testimony of other witnesses.

Soon after the late war, Mr. Chappell employed as his overseer Edward Trent, Sr., who had a wife and several children ; and of these Eliza and Ned Trent were two, the latter having been born on Mr. Chappell's plantation, after his father, Edward Trent, Sr., became Mr. Chappell's overseer. Edward Trent, Sr., or his wife, had furniture ; Mr. Chappell had none except, as one witness says, a pair of old tongs, and, as another witness says, some old andirons. The agreement between Mr. Chappell and Edward Trent, Sr., was that Mr. Chappell should be at all the expense of cultivating the farm, and should furnish bread, meat, and milk for the table ; and Mr. Trent was

to furnish everything else for the table, such as coffee, sugar, &c.; was to work on and oversee the plantation, was to furnish the house, including Mr. Chappell's room; was to occupy the house with Mr. Chappell, and was to receive one-fourth of the crops in kind.

This agreement remained in force until Mr. Trent's death, which occurred some six or seven years prior to the death of Mr. Chappell, and Mrs. Trent, with her family, continued to live in Mr. Chappell's house with him until some three years prior to his death, when she died, leaving Ned and Eliza, the beneficiaries under the will in question, still living there. Ned Trent, on the death of his father, succeeded to the contract of his father, and the same was continued until Mr. Chappell's death, Eliza Trent, in the mean time, doing the cooking and performing the household duties which devolved upon her after her mother's death.

Such being the true relations, and the only relations existing between Mr. Chappell and the Trents, we come now to consider the testimony of the witnesses who were present at the crucial period of time when the paper in question was prepared and executed. These witnesses are Dr. T. W. Nelson, who wrote the paper, and Charles H. Terrall and Joseph M. Crank, the attesting witnesses, and both of them brothers-in-law of the beneficiaries. Obviously, the question being one of testamentary capacity, the case must turn mainly upon the evidence of Dr. Nelson, who was the attending physician, was present and wrote the will, and who had been the intimate friend and physician of Mr. Chappell for thirty years.

The testimony of these witnesses will be examined in the order in which they were introduced, and first as to Mr. Crank. After having the will shown to him, and saying it was the paper attested by him as the will of Mr. Chappell; that it was written and signed by Dr. Nelson for Mr. Chappell; that Mr. Terrell, the other subscribing witness, was also present at the same time and attested the will, and that they and Dr. Nelson

were all present at the same time, Mr. Crank was examined and testified as follows:

Q. "I wish you would tell the jury just what occurred in Mr. Chappell's room on the execution of this paper?"

A. "Dr. Nelson came in and spoke to Mr. Chappell and asked him how he was, and he said, 'How are you, doctor?' and Dr. Nelson says to Mr. Chappell, 'I came to do that writing that I was sent for to do,' and asked him what he wanted wrote. He said, 'I want to do something for these people.'"

Q. "Nelson said he had come to do that writing that he was sent for to do?"

A. "Yes, sir."

Q. "What do you say Mr. Chappell said?"

A. "Mr. Chappell said, 'I want to do something for these people—that is, Ned and Eliza.' Dr. Nelson said, 'Do you wish me to make a deed?' Mr. Chappell shook his head; he did not say anything; if he did, I did not hear it. Dr. Nelson says, 'Do you wish me to assign one of those certificates of deposit to them?' and he said, 'No'; he shook his head and said 'No.' I heard it, and Dr. Nelson says, "Do you wish to give them your estate?' and Mr. Chappell said, 'That would be better,' and Dr. Nelson said, 'Shall I write a will and give them your estate?' He says, 'That would be better.' Dr. Nelson said, 'Shall I write it?' and he nodded his head; if he said anything, I did not hear it; he might have said 'yes,' but I did not hear it. Dr. Nelson then wrote what is on that paper." Then the witness stated that he left the room and went into the yard near by while Dr. Nelson was writing the will; that Terrell and Eliza Trent were out in the yard with him; that he was out in the yard fifteen or twenty minutes, possibly, and was called back into Mr. Chappell's room by Ned Trent; and then he was asked this question:

Q. "Tell the jury what transpired when you went back?"

A. "I went back, and Dr. Nelson had written the will that

you see here, and he handed it to Mr. Chappell, and he had it
in his hands as though he was reading it; he looked as if he
was reading it. I don't know whether he read it or not. Dr.
Nelson says, 'On account of your feebleness, Mr. Chappell,
shall I sign your name for you in the presence of these two
gentlemen?' [myself and Mr. Terrell], and he nodded his
head."

Q. "Did you hear him say yes or no?"

A. "I did not."

Q. "Was anything said by Mr. Chappell, by Dr. Nelson, or
any one else, as to what was contained in the paper—what the
will was?"

A. "He told him, ' Providing it was God's providence, he
could dispose of the will and make any change in it, provided
it was the providence of God that he should get well.'"

Q. "Now go on and tell what occurred?"

A. "As I told you, Dr. Nelson signed the will for Mr. Chap-
pell, by his consent, in the presence of Mr. Terrell and myself.
Mr. Terrell had signed it, and I signed it as *contesting* witnesses.
What else passed I do not have remembrance of."

Yet this witness, in his further examination, seems to have
known and disclosed a great deal more. He proceeds in an-
swer to questions, to say that Dr. Nelson, after writing the will,
and after witness returned to Mr. Chappell's room, told Mr.
Chappell that he was giving his property to Eliza and Ned;
that by this paper " he gave his whole estate to Ned and Eliza
Trent"; that Dr. Nelson asked if witness and Terrell should
attest the paper, and Mr. Chappell nodded his head as "Yes";
that witness did not hear him say yes, but he nodded his head.
" He knew who we was." And when questioned as to Mr. Chap-
pell's mental condition, this witness answered, " He knew what
he was doing." Yet it is admitted that Mr. Chappell did not
utter a word to either of the attesting witnesses, nor either of
them to him during the execution of this paper; that witness,
on the day of its execution, was at Mr. Chappell's assisting in

waiting on him; that he got there that morning about 9 o'clock, and he says that, on going into the sick room, Mr. Chappell, on being spoken to by witness, asked after Neely, the witness' wife, who, the witness says, Mr. Chappell knew to be sick, that witness told him she was better, and that Mr. Chappell said, "I am mighty glad to hear it;" that witness, before the day in question, had not seen Mr. Chappell since the preceding Sunday; and that, after the execution of the paper, witness went home and did not see Mr. Chappell any more during the remaining four days of his life. And the only reason given by this witness (Crank) for saying that Mr. Chappell knew what he was doing, is, that, when Dr. Nelson was talking to Mr. Chappell about the will, the latter looked up and asked Dr. Nelson, "By what way are you to be benefitted," and that Dr. Nelson said he was not to be; "you always paid me what you owed me, but I think you are under some obligations to these people." The last question asked Mr. Crank on his examination-in-chief was this:

Q. "When this will was signed for him, [Mr. Chappell], and attested by you and Mr. Terrell, what was the relative positions of Mr. Chappell and yourself when you signed it?"

A. "He was sitting in bed with the pillows behind him in this position, [knees drawn up and his arms clasped around them]. He was looking at us just as I am looking at you now; we were set right in front of him, and we both wrote our names on an atlas lying on the bed."

The attesting witnesses seem to have learned the importance of being in the line of vision of the so-called testator, so they were *placed* at the foot of the bed, squarely in front of this extremely aged, diseased, wasted, suffering and dying old man, who was propped up in bed, his legs drawn up, and his hands clasped round his knees, and, as is proven by Dr. Nelson, his intimate friend and physician, was, to say the least, in a condition of stupor, or at most, in a state of half consciousness. No wonder that, when these attesting witnesses were called

into the presence of this truly touching death-bed scene, and to perform the solemn duty of attesting his will, Mr. Chappell failed to recognize either of them, or by any intelligible word or act, to evince the least consciousness of their presence. But, in the light of all the circumstances, it is amazing that neither of the attesting witnesses, the neighbors and professed friends of Mr. Chappell, men called by the law to the bedside of a dying man, and to ascertain whether his mental condition was such as to enable him to make a valid will, we say it is amazing that neither of them thought it necessary to ask him a single question, or to resort to any, even the least, means of ascertaining his mental condition. The simple fact that Mr. Chappell did not, on their entering his room, extend to them the ordinary signs of recognition, or say to them that he had had them called in to witness his will, was in itself more than enough to make them vigilant and prompt in extending to him that protection contemplated by law; more than enough, especially when they saw and heard what transpired between Dr. Nelson and the "semi-unconscious" and dying man, to make them recoil with abhorrence from any participation in setting up this paper as the true last will of a conscious and capable testator.

On his cross-examination, this witness [Crank], was asked these questions:

Q. "Where did you go on the Monday morning after old Mr. Chappell was buried?"

A. "Mr. Terrell's from my house."

Q. "Whom did you meet there?"

A. "Ned Trent; Eliza was there when I got there."

Q. "How came you to go there?"

A. "I went with Dr. Nelson."

Q. ."How did you and Dr. Nelson happen to go there?"

A. "He came to my house; my wife was sick, and he said that Miss Eliza and Ned had gone to Mr. Terrell's, and wanted to see me on some business, and I went."

Q. "When you got there, where was Mr. Terrell?"

A. "At home."

Q. "Then, while you and Eliza and Ned Trent, Dr. Nelson and Mrs. Terrell were there all together, what was the business you met there for?"

A. "We met there to see what was best—what disposal we were to make of this will, and what steps we would take; what would they do about it, and about consulting a lawyer."

Q. "Were you not at that time doubtful as to whether the will amounted to anything or not?"

A. "I thought it was a good will; I do not think I had a doubt."

Q. "You were to consult a lawyer about it?"

A. "Yes, sir; go to Lynchburg the next day and consult a lawyer; that is all that was done, and nothing more said about it. It was agreed that we should come to your office [Major Kirkpatrick's], and we all did come the next day, except Eliza and Ned Trent."

Major Kirkpatrick then proceeded to further cross-examine the witness, as follows:

Q. "Now, I want to ask you this question; Was there not a doubt expressed in your presence and in my presence, in my office that day, as to whether the will was worth anything or not?"

A. "I did not make any expression whatever. I did not express myself in the matter at all."

Q. "You stood by and let the others express?"

A. "I was in there, and did none of the talking."

Now, Dr. Nelson wrote this pretended will, and, after the mockery of formal execution was gone through with, he handed it to Eliza Trent and told her to put it away, it having been sealed in an envelope by him. Why, then, if, as this witness says, he thought it was a good will, and does not think he had a doubt about it, did he join in this preconcerted, secret conclave at Mr. Terrell's, and there consult and determine what

was best—what disposal they should make of this paper, and what steps they should take? Why did Mr. Crank go with Mr. Terrell and Dr. Nelson to Lynchburg the next day (Tuesday) to consult a lawyer? Why all these things, if the will was thought by them to be a good and valid disposition of Mr. Chappell's property to the Trents, and to the exclusion of his family and blood? The irresistible inference is that the witness did, as well he might, have doubts—serious doubts, which, unaided by counsel, not only embarrassed, but overwhelmed him. And when Major Kirkpatrick, for the contestants, asked the witness the plain and direct question, "Was there not a doubt expressed in your presence and in my presence, in my office that day, as to whether the will was worth anything or not?" did the witness make the palpably evasive answer: "I did not make any expression whatever; I did not express myself in the matter at all"? And then when the further question was put to him, "You stood by and let the others express?" why did the witness again evade a direct answer, by saying, "I was in there, and did none of the talking"? Observe, the question was not as to whether the witness had expressed the doubt, but whether he had heard the doubt expressed, in Major Kirkpatrick's office, on the day named. And thus, notwithstanding the evident purpose of the witness to evade this very pertinent inquiry, the necessary inference is that he not only entertained the doubt himself, but that he heard it expressed in Major Kirkpatrick's office.

This witness had been previously asked how far he lived from Mr. Chappell, and he answered, "I lived nearly two miles from there." He was then asked to tell who lived within that two miles, nearer to Mr. Chappell than he did at the time of Mr. Chappell's death, and he answered "Mr. Daniel lived on the road about a mile; Mr. Oliver just a short distance—he lived in sight of Mr. Daniel on the same road; Mr. John Steptoe, he does not live immediately on the road, but in sight of the road, a mile and a quarter from Mr. Chappell's." He was then

asked this question, " Is Mr. Steptoe a man of position in that community," and he answered, " He is postmaster and a magistrate." He was then asked, " Who else lives not over a mile," and he answered, " Mr. William Oglesby and Dibrell Oglesby; then Mr. Fergons and Mr. Webber about a mile and a half or two, perhaps; then Mr. Nelson Hawkins and Dr. Nelson not over a mile and a half or two miles." And the witness was then asked, " Are those people you have mentioned any kin to the Trents," and he answered, " No, sir." The people thus named seem to have constituted the neighbors of Mr. Chappell for two miles round, none of them akin to him, and several of them almost within call; and yet, of all of them, Dr. Nelson alone was called to the bedside of this " extremely feeble " and dying man; and most opportunely Mr. Crank and Mr. Terrell, brothers-in-law of the beneficiaries, were present to act the part of attesting witnesses. Why were not some of these numerous neighbors, so near by, and none of them kin of Mr. Chappell, or in any way liable to improper bias one way or the other ? Why were not some two of them called ·as witnesses to the solemn act in question, instead of leaving Mr. Chappell in the hands of Dr. Nelson, the avowed advocate of the Trents, the beneficiaries themselves, and their two brothers-in-law, Crank and Terrell? It is unnatural and unreasonable to suppose that these brothers-in-law did not feel a strong interest in favor of their brother-in-law and sister-in-law, the beneficiaries; an interest such as was well calculated to becloud and give undue bias to their judgment in respect to the testamentary capacity of Mr. Chappell. In view of all the circumstances, as disclosed by the testimony of the subscribing witnesses, of the beneficiaries, and of Dr. Nelson, the failure to call in two or more of the disinterested neighbors, can only be accounted for upon one of two grounds—first, that Ned Trent, when he sent for Dr. Nelson, was impressed with the fact that Mr. Chappell was so far gone that his death was imminent; or, second, that the disinterested neighbors were not

wanted. If it be not true that Ned Trent thought Mr. Chappell's death was very near at hand, why did he send in such instant and extreme haste for Dr. Nelson? Why, too, did he say to the messenger, if Dr. Nelson wants you to go anywhere else " *don't spare the horse.*"

We come now to the other subscribing witness, C. H. Terrell. His testimony may be much more briefly reviewed, inasmuch as he did not see Mr. Chappell, on the day of the execution of the paper in question, until he was called into the sick room to witness its execution. He knows nothing of Mr. Chappell's mental or physical condition at any previous time during that day, nor anything of the alleged conversation between Mr. Chappell and Ned Trent just before Dr. Nelson was sent for, nor anything of what transpired after Dr. Nelson arrived and before the alleged will was written. He was cognizant only of what transpired at the time of execution, and, as to this, he follows in the main in the footsteps of Mr. Crank, his predecessor.

It seems to have been felt to be necessary to account for the opportune presence of this other brother-in-law and subscribing witness. He says that his presence there on that occasion was *accidental.* It will be seen, however, from his own testimony, that he was there solely on account of his solicitude upon the subject of Mr. Chappell's will. In his examination in chief, by the propounders, he was examined, as to how he happened to be there, as follows:

Q. "How did you happen to be at Mr. Chappell's on the 17th of June, the date of this will?"

A. "My being there was accidental; I was passing near Mr. Chappell's, or had started to pass near Mr. Chappell's, and I met Albert Fowler, one of the hands, and I asked how Mr. Chappell was, and he said, 'He is easy now, I believe, but I was sent after Dr. Nelson,' and I asked him what for, and he said he did not know; I asked him if the doctor was at the

house, and he said 'Yes,' and I decided to go and ask him, and when I got to the house with him"—

Q. (Interrupting) "Where is your house and your farm in reference to Mr. Chappell's?"

A. "I am on the Lexington road and I rent part of his farm, and I pass his house to my land that I rent from him."

On his cross-examination, Mr. Terrell's attention was sharply called to the question as to how he happened to be at Mr. Chappell's on the day of the execution of this will, he having been suddenly led away from the subject by the interruption above noted, and he was cross-examined as follows:

Q. "I understand you to say that your being there on that occasion was purely accidental?"

A. "Yes, sir."

Q. "Had nothing to do with making the will?"

A. "No, sir."

Q. "And did not know anything in regard to it until after you had gone to the house?"

A. "Nothing definite. I suspected, after meeting Alfred Fowler; he told me Mr. Chappell was easy, but he had sent for Dr. Nelson, but he did not know what for; but I did not know anything before I reached the yard."

Q. "Why did you suspect he was sent for to make a will?"

A. "From Alfred's answer. I thought it quite likely that Mr. Chappell would make a provision for these people."

Q. "You had never heard anything of his making provision for them until you reached the yard?"

A. "No, sir."

Q. "But you suspected as soon as you heard that Dr. Nelson had been sent for on this occasion that he was there for the purpose of making a will?"

A. "Yes, sir."

Q. "Is that your only reason for suspecting?"

A. "No, sir; the only reason for suspecting it at that time;

Opinion.

but I was not surprised at hearing that Mr. Chappell was making a will in their favor at any time."

Q. "Why did you suspect that he was there on this occasion for that purpose?"

A. "From the answer that Alfred gave me."

Q. "Was not this matter talked about between you and them before that?"

A. "No, sir."

Q. "Never been mentioned at all?"

A. "About this time it had not, but what Mr. Chappell said to me coming from Mr. Weber's, was that he was going to make provision, but did not say at what time."

Q. "When was that?"

A. "More than a year before Mr. Chappell died."

Q. "He had told you that he had told Mr. Trent that Mrs. Trent should not want for anything?"

A. "Yes, sir. I did not intend to say that Mr. Chappell had told me; I had not heard him make this promise to Mr. Trent; he told me that he had."

Q. "He told you that he had told Mr. Trent on his death-bed that Mrs. Trent and —— should not want for anything?"

A. "Yes, sir."

Q. "And this he told you about a year before he died?"

A. "That was more than a year before he died; that was several years ago. It was about the time of Mr. Trent's death that he told me—I reckon about six years ago."

Q. "And that conversation and the one that he had about Ned's going to live in Lynchburg was all the reason you had for that?"

A. "No, sir; from his *general* disposition and kindness to them in many respects I was not surprised at all at his making a will in their favor."

Q. "You had never heard him say that he would make a will in their favor?"

A. "No, sir."

Q. "Did you ever hear him say that he intended to make a will in favor of anybody?"

A. "Never did."

Q. "Did you ever hear him express himself about making a will of any sort—good, bad or indifferent?"

A. "No, sir, not in plain words that he intended or did not intend to make a will."

Now all this, in connection with other parts of Mr. Terrell's testimony, establishes—1st, That on the day the so-called will was executed Mr. Terrell was passing the road near Mr. Chappell's, and did not deem it necessary to call at the house; but meeting with Albert Fowler, who had been after Dr. Nelson, and who said to Mr. Terrell he did not know for what the doctor had been sent for, he (Terrell) jumped to the conclusion—a strange one—that Dr. Nelson had been sent for to write Mr. Chappell's will, and that he (Terrell) went to the house solely by reason of his solicitude on the subject of Mr. Chappell's will. 2d. That about the time of Mr. Trent's death, Mr. Chappell had said to him that Mrs. Trent and Eliza should not suffer for anything, or need not suffer for anything— a very natural and proper remark, but one by no means evincing any purpose on Mr. Chappell's part to make any provision by will for any of the Trents. 3d. That Ned Trent, after his mother's death, had determined to quit Mr. Chappell's employment and go to Lynchburg to live, and that Mr. Chappell had conditionally employed another man to take Ned's place; that about this time Mr. Chappell, in a conversation, said to Mr. Terrell he was sorry Ned was going to leave; that it would be better for him not to go, and that it would be better for him to stay there. And Mr. Terrell says that he told Ned he had better be cautious about leaving, and that Ned did not leave. The absurdity of all this will appear when we come to examine other testimony introduced to show that this and similar unimportant facts are relied upon as previous declarations by Mr. Chappell of a purpose to make a will in favor of

the Trents; that is, in favor of his overseer and the sister of his overseer, to the utter exclusion of his own blood kin and heirs-at-law. This little episode about Ned's purpose to go to Lynchburg to live, proves, if anything, far too much for the purposes of the supporters of this will; it proves that however much of scheming there was by others in favor of the Trents,. (and there was much of it), Mr. Chappell had never in any way impressed Ned Trent with the hope of being to any extent whatever the object of his bounty; for surely Ned Trent, though only some eighteen years of age, would not, had he entertained any such hope, have once thought seriously of surrendering so bright a prospect by leaving Mr. Chappell and going to Lynchburg. Moreover, nothing could be more natural, thoughtful, or just than for Mr. Chappell, a man of age and experience, to say of a raw and inexperienced boy like Ned Trent, that he was sorry that Ned was going away, and that it would be better for him to stay where he was; or, in other words, that he was doing well where he was, and that it would be better to continue on than go to Lynchburg and be exposed to the temptations incident to a strange boy's life in a city, without the wholesome restraints and protection of watchful parents and friends.

In some, not unimportant, respects there are discrepancies between the statements of Mr. Terrell and those of Mr. Crank, but it is not necessary to pursue them in detail. In most respects he follows the line of thought and even the very language of Mr. Crank with remarkable precision. For instance, when questioned as to Mr. Chappell's mental capacity at the time of the execution of the paper in question, he says: " He knew what he was doing," the exact words used by Mr. Crank in answer to the same question; and yet Mr. Terrell did not see Mr. Chappell on that day until he was called into the sick room to become one of the attesting witnesses, and then the usual salutations were not passed, nor was a word uttered by Mr. Chappell to either of them or by either of them,

nor does it in any way appear that Mr. Chappell was really conscious of their presence. Mr. Terrell, like Mr. Crank, seems to have been well up on the requisite relative positions of testator and attesting witnesses, and describes his position, at the time of attestation, as at the foot of Mr. Chappell's bed and right in front of him.

Taking the testimony of the two subscribing witnesses together, and weighing it in the light of the circumstances disclosed by them and in the light of other evidence on behalf of proponents and in the light of all the surrounding circumstances, the unavoidable conclusion is, either that the judgment and discretion of these subscribing witness was beclouded by their very natural partiality to their brother-in-law and sister-in-law, the beneficiaries under this instrument, or that they were ignorant of the duty imposed upon them by the law to test the mental capacity of the testator before certifying, as they do by their attestation, to his sanity and capacity to make a valid will.

In discussing the duties of both medical men and attesting witnesses on such occasions, it is said, in 1st Redfield on Wills, p. 96: "It would always be good ground of justification, if, at the request of the witness, the testator had been made to repeat substantially the leading provisions of his will from memory. If a dying or sick person (or any other one) cannot do this without prompting or suggestion, there is reason to believe that he has not a sane and disposing mind." And the author adds: " The language of *Walworth*, Chancellor, in *Scribner* v. *Crane*, 2 Paige, 147, 149, is well worthy of regard and remembrance: 'No person is justified in putting his name, as a subscribing witness to a will, unless he knows from the testator himself that he understands what he is doing. The witness should also be satisfied, from his own knowledge of the state of the testator's mental capacity, that he is of sound and disposing mind and memory. By placing his name to the instrument, the witness, in effect, certifies to his knowledge

·of the mental capacity of the testator, and that the will was executed by him freely and understandingly, with a full knowledge of its contents.' "  And in a very elaborate and instructive note to the same page, in reference to the doctrine stated in the text, it is said:

"We apprehend that what is here said in regard to the compromise of professional character, by becoming the witness to a will where the testator is not in a proper condition to execute it, will be somewhat unintelligible to the American mind. The impression in England is, both in the legal and medical profession, that one is bound to give directions on such occasions in regard to what the testator is competent to do, and that the medical attendant is responsible that he do not countenance the act of attempting to execute a will after the patient is incompetent to comprehend its import; that by consenting to become a witness of the act he virtually certifies that the testator is of sound, disposing mind and memory; that if such proves not to have been the fact, the character of the medical witness is seriously compromised, inasmuch as he is subjected to one or the other of the alternatives resulting from the dilemma in which he is thus placed, either that he was incompetent to detect such incapacity, or else that, knowing of its existence, he voluntarily connived at the creation of an instrument of great importance and solemnity while the supposed actor was in a state of mental unsoundness which incapacitated him for its valid execution. Under such circumstances the connivance may, with some show of reason, be regarded as implicating the medical witness in a virtual fraud upon the legal disposition of the property which would otherwise follow, since the attempt to execute a will, at such a time, is getting up the shadow of a legal instrument, the effect of which will be, if successfully carried through, to defeat legal rights which have already practically taken effect and become vested, when the simulated agent no longer possesses the capacity for voluntary action. It has always seemed to us there was great

justice and propriety in the English view of the subject. We think any gentleman, whether professional or not, would feel a delicacy and hesitation in regard to becoming a witness to such a transaction." And having thus vindicated the English view as preferable to the lax notion prevailing, to some extent, in this country, the author proceeds: "But with us the public opinion, which is the sovereign arbiter of duty, assumes sometimes to override the dogmas of written law. It is thus, no doubt, that it has come to be understood here, by some at least, that the witnesses to a will are not to be regarded as having expressed any opinion in regard to the sanity of the testator. It seems to be supposed that they are only witnesses to the act of signing. But when it is considered that the witnesses to a will must certify to the capacity of the testator, as well as to the act of execution, the transaction begins to assume a somewhat different aspect. One who puts his name as a witness to the execution of a will, while he was conscious that the testator was not in possession of his mental faculties, places himself very much in the same attitude as if he had subscribed, as a witness, to a will which he knew to be a forgery, which every honest man could only regard as becoming accessory to the crime by which the will was fabricated; so that it is not improbable that the want of proper appreciation of the discredit resulting from the act of becoming a witness to the execution of a will, by one confessedly incompetent to the proper understanding of the instrument, may, and probably does, result chiefly, with us, from the general misapprehension of the law upon the subject, rather than from any settled disposition to disregard its dictates if correctly understood."

This last remark we think peculiarly applicable to the subscribing witnesses in the present case. Their legal competency as attesting witnesses cannot be denied, but they were called upon and acted in great haste, and without sufficient opportunity for that calm reflection and deliberation so essential to an

act of such importance and solemnity, and, doubtless, were ignorant of the duty imposed upon them by law to test the mental capacity of the testator, and to know from *him* that he knew what he was about. This they neglected to do; and, although they say they were placed directly in front of him, and that he was looking at them, to use the language of the witnesses, "just as I am looking at you now," this is not enough; the all important thing was wanting, the actual personal knowledge of the attesting witnesses, gathered from the testator himself, that he was, at the time of the execution of the instrument, possessed of a sane, disposing mind and memory. That the testator in the present case did not possess such a mind and memory is too plain to admit of any reasonable doubt a proposition supported by the testimony of the subscribing witnesses themselves, and this notwithstanding their declaration that the testator " knew what he was doing." The result is that the subscribing witnesses fail to prove that Mr. Chappell was, at the time of the execution of the paper in question, possessed of a sane, disposing mind and memory, and that, therefore, said paper is not his true last will and testament.

We come now to the testimony of Dr. T. W. Nelson, the attending physician, who had been Mr. Chappell's intimate friend and physician for thirty years. He had known Mr. Chappell much longer and better than either of the attesting witnesses, and was greatly more competent to judge of Mr. Chappell's mental condition than any witness who testified for the propounders, and upon his testimony alone, it will be seen, the case is clearly with the contestants, the appellants here.

Dr. Nelson twice testified in regard to the execution of this paper—once when it was offered, *ex parte,* for probate in the county court, and again on the trial of the issue in this suit. In his statement before the county court, when asked whether Mr. Chappell was competent, at the time of the execution of this paper, to make a will, Dr. Nelson replied: " I am in doubt

about it. I would rather state the circumstances. He made the will at my suggestion. I am not thoroughly satisfied what constitutes competency. I said, ' Mr. Chappell, I understand you wish to give the Trents some portion of your estate.' He was sitting up in bed, with his hands locked in front of his knees. He opened his eyes, showing he comprehended my statement to him. I then said, ' Do you wish (knowing he had some certificates of deposit) to give them one of these certificates of deposit?' He said, ' I think not.' I then made this explanation to Mr. Chappell: I said, ' If you will make a will and give them your estate, you can, in the event of your recovery, amend or destroy this will.' His remark was, ' That would be better.' I then sat down and wrote the will as it is. Three or four times I distinctly told him what was the purport of this will. I did not read it to him. I said, ' This will gives your whole estate to the Trents.' After taking the will in his hands (he had *paralysis agitans* then and for years before), I knew he could not sign the will. I said, ' You are too feeble to sign your name.' (This was in the presence of the attesting witnesses.) ' Shall I sign it for you?' He said, ' *Yes,' with a nod.* I then signed his name in the presence of these witnesses. I remember this much distinctly. I am satisfied he thoroughly comprehended what I said to him. I was fully so impressed at the time."

In his statement made at the trial of the issue, Dr. Nelson differs, in certain not unimportant particulars, from his statement before the county court. His statement on the trial of the issue is as follows:

"Alfred Fowler, an employee of Mr. Chappell's, came to me on Tuesday, between 2 and $2\frac{1}{2}$ o'clock, the 17th of June, and brought me a note from Mr. Trent, asking me to go over to Mr. Chappell's. I went to Mr. Chappell's after the receipt of the note. I rode up and tied my horse, as I always did, and got down and went into the room. On entering the room, Mr. Chappell was asleep. I suppose I had been in the room

but a very short time before Mr. Chappell roused up, and when aroused up I went to the bed and asked Mr. Chappell how he was. He looked at me, and I forget his remark— 'about as he had been,' that was the amount of it; and he asked me how I was, and after some remark or two in regard to myself, I said to him that I had come over to see him in regard to doing something for the Trents, or giving the Trents something, I do not know which of these phrases I used, and *I do not think he made any reply to it.* I then said: ' What is it you wish to do? Do you wish to make a deed to some portion of your estate (making a short pause), or do you wish to give them one of these certificates?' He distinctly said to me, after making some delay, not very long, however, ' I think not.' I then said to him: 'Mr. Chappell, if you prefer to do so, you can make a will, and in the event of your recovery, you can amend or cancel this will.' He said (nodding his head up and down), 'I think that would be better.' I asked him some questions about it—I am not positive—the amount of it was, what portion of his estate should I give them; that is the idea I wished to ascertain. ' Shall I make a will and give them your estate?' He nodded assent. I remember he did not say yes or anything. He made this motion [nodding his head]. I sat down and wrote that paper you see there. During my writing of the paper there was no conversation with him. Whenever I looked at him he was aroused. After the will was written as you have it, I went to Mr. Chappell and said: ' I have written this your will, which gives Miss Eliza and Ned Trent your entire estate,' which I repeated as often as twice, and think probably three times, speaking right distinctly each time, fully as loud as I am talking now, and he nodded assent. I do not remember positively whether he spoke or not. When I proposed to write this will he did speak as well as give the nod, which was somewhat his habit, like all sick people. I then said to him: ' As you are too feeble and tremulous to sign your name, shall I sign it for

you?' He gave consent, as I remember it now, in a hoarse whisper. I took some prescription blanks out of my pocket, and, the pen and ink being already provided, signed his name as you see it there. No, I told him before signing it (I transpose a little here), 'it is necessary that witnesses should see me sign your name and hear you give your consent to my doing so,' and casting about, I said, 'How would Terrell and Crank do?' And he gave consent to it, and I had them called in, or called them in myself (I think I stepped to the door and called them myself), and in their presence repeated the question. I signed his name, and they took the will to the foot of the bed, and he (Crank) rested the paper on the foot of the bed on which Mr. Chappell was lying and signed, and also Terrell, at the foot of the bed, signed his name."

When these two statements of Dr. Nelson are compared, it at once appears that they are materially different; and it is not necessary to trace these differences in detail, except in two particulars: 1st. In his statement before the county court Dr. Nelson says: "I said, 'Mr. Chappell, I understand you wish to give the Trents some portion of your estate.' He was sitting in bed, with his hands locked in front of his knees. He opened his eyes, showing he comprehended my statement to him." This statement, if anything, shows that, on Dr. Nelson's arrival, Mr. Chappell was not asleep, but sitting up (propped up) in bed, with his eyes closed, and that Dr. Nelson at once broached the subject or object of his visit by the remark, " Mr. Chappell, I understand you wish to give the Trents some portion of your estate," &c. But, in his statement on the trial of the issue, Dr. Nelson says that on entering the room he found Mr. Chappell asleep; that he waited but a very short time, and Mr. Chappell roused up; that he then went to the bed and asked him how he was; that Mr. Chappell said, "About as he had been," and asked me how I was; and after some remark or two in regard to myself, I said to him that I had come over to see him in regard to doing something for the Trents, or

giving the Trents something; *I don't* know which of those phrases I used." And thus it appears by the one statement that Mr. Chappell was not asleep, but was sitting up in bed, with his eyes closed, and that when Dr. Nelson said, "I understand you wish to give the Trents some portion of your estate," he (Mr. Chappell) opened his eyes, showing he comprehended the remark of Dr. Nelson; and by the other, that Mr. Chappell was asleep, and in a short time woke up, when Dr. Nelson, after considerable conversation, made known the object of his visit in different language and of different import, to which Mr. Chappell made no reply whatever. And in the statement on the trial of the issue Dr. Nelson entirely omits the words, "he opened his eyes, showing he comprehended my statement to him"; and well might he omit them, for nothing could be more absurd and ridiculous than to say that Mr. Chappell comprehended Dr. Nelson's statement because he opened his eyes. The most stupid animal that walks the earth would have done the same thing.

But taking Dr. Nelson's two statements together, it will be seen that the pretended will was made wholly at his suggestion; that when he first approached Mr. Chappell on the subject and stated the object of his visit, he received no reply whatever; that he in quick succession suggested that Mr. Chappell make a deed giving the Trents a portion of his estate, to which suggestion also he received no reply; that then, and almost without a pause, he suggested that Mr. Chappell give them one of his certificates of deposit, when, for the first time, Mr. Chappell made a verbal response, and said, "I think not." Then, with hot haste, the matter of the will was pressed upon Mr. Chappell, and he was argued with and urged to make a will giving his estate to the Trents, the argument being enforced by the suggestion that, in the event of his recovery, he could change or cancel the will at his pleasure; in reply to which Mr. Chappell said, "That would be better." And upon this, and this only, Dr. Nelson sat down and wrote the will

giving Mr. Chappell's entire estate to the Trents; and this under circumstances clearly showing that, to say the least, Mr. Chappell was so enfeebled by age, disease, and suffering as to be too weak to resist the urgent importunities pressed upon him by Dr. Nelson—circumstances so clearly evincing a want of testamentary capacity as to constrain Dr. Nelson himself to state, under oath, at the trial of the issue, that he doubted Mr. Chappell's capacity to make a will.

In a searching examination-in-chief and cross-examination, it was sought on the one hand to wipe out this doubt entertained by Dr. Nelson, and on the other, to have it explained and solved upon just principles. A brief review of the evidence, thus far, of Dr. Nelson, will show a strange state of things. In one statement, in his examination-in-chief, he says that whenever he looked, during the writing of the will, at Mr. Chappell, he was awake; and in another, in answer to the question, "What is your opinion as to whether he understood," [meaning the suggestions made to him], he answered: "Mr. Chappell closed his eyes as if asleep, momentarily, once or twice during the preparation of the will, on my saying to him what the contents of the will were, but when I called to him or said to him about as loud as I am speaking now, he was certainly conscious." This means, if anything, that when Dr. Nelson was going through the formal mockery of stating the contents of the will, Mr. Chappell was either asleep or was in a state of stupor, but that, when called to in a loud voice, he was conscious. But conscious of what? Simply that he had heard a loud voice, which temporarily aroused him; but not, in the light of the evidence and the surrounding circumstances, that he intelligently comprehended what was going on; for that, in the light of the evidence, was impossible.

But being further pressed by counsel in support of the will, and asked to state whether, in his opinion, Mr. Chappell understood that he was making a will giving his estate to Ned and Eliza Trent, Dr. Nelson answered: "The line of demonstra-

tion between when a man is—there is some doubt in my mind as to this—I would rather make a full and honest statement of the facts, and that is this: There was an entire absence of spontaneity in regard to this matter, but acting upon the honest impression that Mr. Chappell, as I believed then, and now believe, wished to do something for these people, who were the beneficiaries of the will, I made a suggestion mildly and respectfully, and in obedience to my suggestion, in every particular, he made that will."

Dr. Nelson was then asked, "Did he understand your suggestions?" and he responded, "I am impressed that he did. It was my honest impression then, and, on subsequent reflection, it is now, that he understood the suggestions I made, and acted on them." Counsel for the proponents again asked Dr. Nelson: "At the time you signed Mr. Chappell's name to this paper for his will, were you then, and are you now, of the opinion that he understood what he was doing?" and the answer was: "He unmistakably gave his assent to my action in the matter." They then propounded to him the very suggestive question: "You are satisfied, then, that he did know that he made his will giving the property to Ned and Eliza Trent?" and the answer was: "I am sure that he did." And yet it clearly appears from the cross-examination of Dr. Nelson, now to be reviewed, that, notwithstanding his answer, indicating the utmost caution and reserve touching his impressions—his honest impressions, etc.—he, in fact, was far from believing that Mr. Chappell *sufficiently* understood, at the time, what was then being done to make the execution of this paper his free, voluntary, and intelligent act. On cross-examination Dr. Nelson was asked whether he doubted as to Mr. Chappell's competency, and he responded: "Yes, sir; I have stated repeatedly to you here in this room, I am in doubt as to what constitutes competency to make a will. I have had no explanation of that matter. One of these doubts was an entire absence of spontaneity on the part of Mr. Chappell, the testator,

and a further doubt (Mr. Chappell, as I have said, died of the exhausting or asthenic trouble of dysentery; and I was impressed this way, as his medical man—that Mr. Chappell was more—there was a greater portion of physical exhaustion in his case than there was of intellectual exhaustion. I think he was more himself intellectually than he was physically, and that Mr. Chappell lapsed into a condition as we have just been wrangling over) whether he was semi-unconscious or asleep; I am not sure; and the further reason—there are three of them—that Mr. Chappell did not take that interest in the execution of his will that it seems to me he should have done; but whether it was due to physical exhaustion—it may readily have been due to that—or to any decided wish" (evidently meaning *the absence* of any decided wish) "to dispose of his property as suggested by me, I am not sure. He did not appear to me to take that interest in the matter of making his will that I expected of him. Whether this was physical, as it may have been, or want of interest in the matter I am in doubt." He is then asked this question : " I understood you to state that you doubted then, and still doubt, whether Mr. Chappell had capacity to make a will—a doubt growing out of three things or facts : First, that there was an entire absence of spontaneity on Mr. Chappell's part in making this will; second, that whilst the will was being written and executed he sometimes lapsed into a condition of semi-unconsciousness; and third, that he did not show that interest in this matter which you would have expected ? "

A. " You do not give fully the second reason. It is this : He lapsed into a state, now and then, or occasionally, or sometimes, lapsed into a condition of apparent semi-unconsciousness, and whether that was due to his having fallen asleep, which in his asthenic condition might very readily have been, or to *unconsciousness*, I am undecided, and furthermore, that he did not express or impress me as having that interest in the disposition of his estate which I expected of him. That is as

plain as I can say, and all I have to say of the execution of this will."

Now it clearly appears that Dr. Nelson, in his testimony thus far, has made two apparently contradictory and irreconcilable statements, one of which is that Mr. Chappell did understand what he was doing, and said and did all that was necessary to make the paper in question his last will and testament; the other, that all during this time, and down to the time of his testifying, he doubted whether Mr. Chappell was competent or not. This seeming contradiction of himself was then explained to Dr. Nelson, and he was pressed to make an explanation of the matter; and Dr. Nelson was made to see that there was no room for his doubts, if the matters stated by him were true. And finally he was asked this question: "I want to get into your mind what I am after. I am still at a loss to see how a man with intellectual and physical exhaustion seemed to comprehend what you suggested and intelligently assented to what you suggested. I am at a loss to see where comes in this doubt growing out of his stupified condition."

A. "I have in my mind what you wish to put in it. I can see this, sir; that Mr. Chappell might have consented to what I said to him, and that I might have possibly misinterpreted his consent. I say this, I have always had some doubts, and have given you the occasion of these doubts."

It thus appears that Dr. Nelson, the physician and intimate friend of Mr. Chappell for many years, was not only the active and zealous advocate of the Trents, but persistently and unduly urged their claim upon Mr. Chappell; that he, the only person who was with Mr. Chappell during the whole time of the writing and execution of the will; the one who, by education and long association with Mr. Chappell in the relation of physician and patient, and who, by reason of his professional skill and experience, was best qualified to ascertain and know Mr. Chappell's mental condition—we say that he, after a long hunt, is brought to admit that the will in question was made at his

suggestion "in every particular"; brought to admit that he has doubts—doubts well founded and insurmountable, whether, at the time of the execution of this paper, Mr. Chappell was capable of making a valid will. Can it be said with any degree of reason that a man eighty-five years of age, enfeebled by disease and racked by pain, who assents to a will, cruelly unnatural and unjust, and which clearly appears not to have been the offspring of his own volition, is a free and capable testator? We think not. Can it be said that a paper executed and acknowledged as this was, and assented to by some three ordinary nods, one "reflective nod," one hoarse whisper "yes," and one "I think that would be better," is the true last will and testament of a man possessed of a sound and disposing mind and memory? We think not. And finally, can it be said that a testamentary scheme which did not originate in the mind of the alleged testator, but was wholly dictated or suggested by the attending physician, under circumstances which preclude the idea that the simulated actor knew what he was doing, is a good will? We think not, and the law says not.

The bill in the present case charges both mental incapacity and undue influence by others to procure the will here involved. In the light of the testimony of Ned Trent, of the two subscribing witnesses, and of Dr. Nelson, the attending physician and draughtsman of the will, it seems incredible that any impartial mind could come to any other conclusion than that, at the time of the execution of the pretended will, Mr. Chappell was not possessed of sufficient mental capacity to enable him to make a valid will. But conceding, for the sake of argument, that Mr. Chappell possessed sufficient sanity for general purposes, and sufficient soundness and discretion, if let alone, to regulate his affairs in general, yet it cannot be denied that Dr. Nelson's participation in procuring the will amounts to undue influence, under all the circumstances, and that the paper is more the will of Dr. Nelson than of Mr. Chappell.

Judge Redfield, after a careful review of many adjudged cases on the subject of undue influence, says : " From all this, and much more, which might be adduced from the cases already decided, it is obvious that the influence to avoid a will must be such as—

1st, To destroy the freedom of the testator's will, and thus render his act, obviously, more the offspring of the will of others than of his.

2d, That it must be an influence specially directed towards the object of procuring a will in favor of particular parties.

3d, If any degree of free agency, or capacity, remained in the testator, so that, when left to himself, he was capable of making a valid will, then the influence, which so controls him as to render his making a will of no effect, must be such as was intended to mislead him to the extent of making a will, essentially contrary to his duty, and it must have proved successful, to some extent, certainly." 1st Red. on Wills, 524–5.

Dr. Nelson's participation in procuring this will comes squarely within each and all of the three propositions above laid down. And in a very elaborate and valuable monographic note by Mr. Freeman, appended to the Minnesota case of *In re Hess's Will*, reported in 31 Am. State Reports, 665, will be found a number of cases cited and quoted from, which fully sustain the doctrine in 1st Redfield on Wills, referred to above.

Dr. Nelson, in the ardency of his solicitude in behalf of the Trents, overstepped, though doubtless unwittingly, the boundaries of good judgment and sound discretion, and in doing so, omitted the duty imposed by law, of testing the mental capacity of Mr. Chappell before taking part in procuring the will in question.

It is said by a distinguished author, and the same doctrine runs through the books, that " The rule for testing the mental capacity of a person to do an act requiring mental comprehension and disposing judgment, given by Dr. Taylor, is as reliable as any one, perhaps. ' If a medical man be present when

the will is made,' says this learned writer, ' he may easily satisfy himself of the state of mind of the testator by requiring him to repeat from memory the mode in which he has disposed of the bulk of his property. Medical men have sometimes placed themselves in a serious position by becoming witnesses to wills under these circumstances without first assuring themselves of the actual mental condition of the testator.' " 1 Red. on Wills, 95–6.

Dr. Nelson, as well as the subscribing witnesses, failed to take this necessary precaution, and his failure has resulted in a paper purporting to be the last will and testament of Richard T. Chappell, when the alleged testator is proved by the testimony of the proponents not to have possessed at the time mental capacity to enable him to make a valid will. It matters not that both of the subscribing witnesses say that Mr. Chappell " knew what he was doing," when he did not recognize either of them when they were brought into his room to be made attesting witnesses, when he uttered not a word to them nor they to him, and when, to all appearances, he was utterly unconscious of their presence. It matters not that they say they were right in front of him when they subscribed their names, and that he was looking straight at them at the time; · when, from their own evidence, taken all together, it is evident that his look was not that of intelligent comprehension, nor his acts those of a man in the exercise of free and unrestrained volition. In other words, the attesting witnesses, Crank and Terrell, prove nothing to the purpose of establishing the validity of the paper in question as the will of Mr. Chappell, but, on the contrary, by their evidence, facts and circumstances are disclosed which are utterly irreconcilable with the idea of testamentary capacity.

Nor is it material that Dr. Nelson, his attending physician and draughtsman of the pretended will, had conceived a theory inconsistent with the stubborn fact, admitted by him, that he doubted whether Mr. Chappell was possessed of sufficient

mental capacity to enable him to make a valid will; nor that, in aid of this specious theory, Dr. Nelson, after a long, earnest and anxious examination-in-chief, was at last induced to so far break away from his mere impressions as to say, in effect, that he was sure Mr. Chappell knew he was making this will, giving his entire estate to Ned and Eliza Trent; for, on his cross-examination, he again and again repeated and clung to the fact, admitted on his examination-in-chief, that he had *doubts* as to Mr. Chappell's mental capacity, and, so far from weakening, as his cross-examination proceeded, he grew stronger and cleverer in the expression of his doubts, and finally admitted that he may possibly have misinterpreted what, at the time, he took to be Mr. Chappell's assent to *his* (*Dr. Nelson's*) action in the premises. In other words, Dr. Nelson is not so sure that Mr. Chappell's negative shakes of the head, his three or more ordinary nods, and one *reflective* nod of his head, can be relied upon to show that Mr. Chappell understood what was being done, and gave his free and intelligent assent thereto. Nor is the matter changed when there is superadded the one hoarse whisper, "Yes," which was not remembered by Dr. Nelson when he testified before the county court, but had come to his recollection when he testified at the trial of the issue. Nor is it material that Mr. Chappell made the remark, "that would be better," in reply to Dr. Nelson's suggestion that if he would make a will giving the Trents his estate, he could, in the event of his recovery, change, alter or cancel the will at his pleasure; in the light of all the evidence, and especially that of Dr. Nelson himself, it is too plain to admit of doubt that Mr. Chappell was mentally, as well as physically, too weak to comprehend Dr. Nelson's suggestion with regard to a will giving his estate to the Trents. Moreover, if it could be fairly conceded that Mr. Chappell still retained sufficient mind to answer ordinary questions, yet that is not enough. He must retain sufficient *active memory* to collect in his mind, without prompting, particulars or elements of the business to be transacted, and to

hold them in his mind a sufficient length of time to perceive at least their obvious relations to each other, and be able to form some rational judgment in relation to them; he must be of sound and discerning mind and memory, so as to be capable of making a testamentary disposition of his property with sense and judgment with reference to the situation and amount of such property, and to the relative claims of different persons who are or might be the objects of his bounty.

It would seem impossible for any impartial mind, guided by the facts as disclosed by the evidence of the draughtsman of the will, and the two subscribing witnesses, to come to any other conclusion than that Mr. Chappell was not, at the time, possessed of the requisite mental capacity to enable him to make a valid disposition of his property. The few words uttered by him show conclusively that he had no intelligent apprehension of what was transpiring; that the state of his mind, if any he had, was not active and capable, but that he was a mere passive instrument in the hands of Dr. Nelson, at whose suggestion the so-called will was made, in every particular; and that no human being ever heard him seriously intimate any purpose to make any such will, or any provision for the Trents whatever, until within two or three hours prior to the procurement of the paper in question, and that he then proposed to make any provision for them depends upon the statement of Ned Trent alone. On every other occasion, when he spoke seriously with respect to making a will, he uniformly said, " the law makes the best will," or that, " the law makes a good enough will for me."

Dr. Nelson, like the attesting witnesses, proves nothing which seriously tends to support the will. On the contrary, the facts disclosed by him effectually establish the fact that Mr. Chappell was not, at the time of the execution of the paper in question, possessed of a sound and disposing mind and memory; and that the instrument in question, so far from being the free and voluntary act of Mr. Chappell, is, in fact, nothing

other than the will of Dr. Nelson disposing of Mr. Chappell's estate.

When a paper, purporting to be the last will and testament of a free and capable testator, is made under such circumstances as characterize this transaction, and, without any explanation, the next of kin, and heirs-at-law, are wholly disinherited, in favor of strangers to the family and blood, it devolves upon those claiming under the alleged will to explain, by clear and satisfactory proof, how a testamentary disposition so unnatural and so unjust came about. Feeling it incumbent upon them to respond to this humane requirement of the law, and of common sense, the beneficiaries under the alleged will seem to have scoured the country, for many miles around, to produce evidence—first, that Mr. Chappell disliked his blood kin and heirs-at-law; second, that he was much attached to the Trents; and, third, that the will is in accord with the previously expressed intentions of Mr. Chappell. The supporters of the will, in order to come down as near as possible to the time when this will was executed, commence with Mr. William P. Burks, who, in the capacity of land assessor, was at Mr. Chappell's house in the month of May preceding the death of the latter. He says he had known Mr. Chappell for twenty years; that witness was at Mr. Chappell's in 1881 or 1882, when the latter was just recovered from a severe spell of sickness, and that he (Mr. Chappell) related to witness an amusing incident, to the effect that one of his relatives in the South, hearing of his sickness, had written a letter to the administrator of Richard Chappell; that Mr. Chappell told witness that he had answered the letter to let them know that Richard Chappell was his own administrator, and that they would never get a dollar of his money; that Mr. Chappell did not tell witness who those relations were; but that he said that during his illness they had not inquired after him, or paid him any attention, but as soon as he was thought to be dead, or in a dying condition, they were solicitous of his estate. It is true that the rela-

tive in the South who wrote this letter was premature and over solicitous, but be this as it may, the solicitude thus shown was natural, and was by no means so intense and grasping as that exhibited by the beneficiaries under the pretended will in question.

This witness (Burks) then proceeds to say that he was, up to 1885 or 6, at Mr. Chappell's house twice a year; that he saw Ned and Eliza Trent every time he was there; that when he was first there, Ned was a little boy six or seven years old, riding about the farm behind Mr. Chappell, &c.; that witness had seen Mr. Chappell more with Ned Trent than with the rest of the family; that witness had taken dinner at Mr. Chappell's house, when the Trents were all at the table, and Mr. Chappell was very kind to all, and, witness thinks, he spoiled Ned a good deal while he was a chap. And the witness proceeds to say further, that he was at Mr. Chappell's house in May, 1890, to assess the landed property of the latter; that Mr. Chappell thought that the assessment was too high; that witness said to him, "Well, it don't make any difference much any way; you are going to give out; some one else will pay the taxes on it." That Mr. Chappell thereupon asked witness about his little boy and what his name was, and that witness replied, "Henry Gray," and added, "I will have it changed to Richard Chappell, since I find you have no heirs"; that Mr. Chappell and witness were joking, and that Mr. Chappell laughed, when witness said, "I reckon Ned will get the bulk of your estate," and that Mr. Chappell said, "Yes, but I don't want Ned to know it," and the witness adds, "I did not tell him." Yet he must have told Ned, or some one acting in his interest, or the utterly irrelevant and trifling matter could never have cumbered the record before us.

Next comes John L. Oglesby, who had been, or was, a commission merchant in Lynchburg, who says he knew Mr. Chappell; had, as his commission merchant, transacted business for him; that he never was at his house, and that he only knew

the Trents when they came to Lynchburg; that he had known
Mr. Chappell for twenty years; that for all that time, except
two or three years, he, or the house of which he was a mem-
ber, sold Mr. Chappell tobacco; that Ned was a small boy
until he came to town on business; that he came in the wagon
sometimes, and sometimes behind Mr. Chappell on horse-
back, and "that they were just as father and son, after that
style." When the witness was asked if he ever heard Mr.
Chappell say anything about making a will, he answered, " I
did, sir "; and then proceeded to say: It was some time after
his recovery of a spell he had in 1881; that he and Mr. Chap-
pell had, previous to this, talked socially, and that Mr. Chap-
pell had spoken of his fondness for Ned Trent, Sr.; that
witness congratulated Mr. Chappell on his recovery, and re-
minded him how near he came to death, and not having pro-
vided for the Trents; that Mr. Chappell said: " Yes, I intend
to give something," and that it was in that connection the
thing came up. The witness then says that he said to Mr.
Chappell : " Well, you ought to, make a will," and that Mr.
Chappell replied : " I think the law makes the best will, but in
my case there is an exception." The witness then proceeds to
say he had heard Mr. Chappell express his feelings toward his
relatives, and that he was not friendly towards them.

On cross-examination this witness was asked : " I under-
stand you to say that you reproached him or reproved him for
not doing something for Ned, as he had been sick ? "

A. " No, sir; I did not say that; it was the senior Trent."

Q. " You said something that he ought to have done ? "

A. " I intimated to him ; he had.told me previously that he
would do it; I just asked if he had not better make a will."

Q. " What did he say ? "

A. " He said he thought the law makes the best will gener-
ally, but in cases there were exceptions; I do not recall the
exact words; I want to state that through our family Mr.
Chappell knew that I knew of what had transpired backwards,

and we talked a little differently from ordinary business men; there was no relationship between us whatever."

The expression of the witness "transpired backwards," though unusual, is, as respects this case, quite apt. The main trouble in the case is that too many things "transpired backwards." The evidence of this witness, taken in connection with other evidence, clearly establishes three things—first, that the suggestion made by him to Mr. Chappell to make a will and provide for Ned Trent, and Mr. Chappell's reply that he intended to give something, referred to Ned Trent, Sr., and not to Ned Trent, Jr., one of the beneficiaries under the will in question; second, that there was an organized design during the lifetime of Ned Trent, Sr., and while he was the overseer of Mr. Chappell, to procure from Mr. Chappell some provision by will in his favor, and that such design, on the death of Ned Trent, Sr., was earnestly pursued in favor of Ned Trent, Jr., and finally culminated in the so-called will here in question; and, third, that Mr. Chappell, when approached on the subject, prior to the execution of this paper, uniformly declared that the law made the best will.

This declaration, uniformly made by Mr. Chappell, with full knowledge on his part that by his intestacy his estate would descend to his next of kin and heirs-at-law, was tantamount to an express declaration on his part that it was his intention that it should pass to and be enjoyed by them. How absurd, then, is the claim that he disliked his next of kin, was affectionately inclined towards the Trents, and made the will in question in pursuance of a long-cherished purpose. When Mr. Elam, in the interview already referred to, urged Mr. Chappell to make a life provision for his brother, the appellant, Josiah Chappell, he readily agreed to do so; and when, in the same interview, Mr. Elam told him it was reported that he intended to give his estate to the Trents, he indignantly denied the truth of the report, and hooted at the idea of giving the Trents anything.

Still other witnesses are introduced, who testify to like

trifles, which are relied upon to show that Mr. Chappell disliked his next of kin, was devoted to the Trents, and made the will in question in pursuance of a previous and long cherished purpose.

Martin C. Parks testifies that about the year 1887, he was at Mr. Chappell's some two weeks, engaged in pealing and packing bark, and boarded at Mr. Chappell's part of the time; and when asked to tell the jury what were the relations existing between Mr. Chappell and Ned and Eliza Trent—how they treated each other, he answered: "I have remarked a good many times that I never saw anybody kinder to their father than they were to Mr. Chappell, because he said to Ned when he was sick, I wish you would wash my feet, they feel sore, and Ned got the water and washed them;  *  *  * " and the witness was then asked: " Were the relations that existed between them such as existed between landlord and tenant or between employer and employee ?   What, from their conduct, did you regard as the relations in which they held each other?" Ans. "I think it was more like a parent to his children, as far as I know; I remember on one occasion I wanted to borrow a horse from Mr. Chappell; when I first went there he had two colts he did not use; when I went to Mr. Chappell he said that is the only horse and Ned rides it, and if he is not going to use it you can have him.   I went to Ned and he said I could have him; he said it was Mr. Chappell's horse, and I saw Mr. Chappell and got the horse; it seemed like whatever Ned said to Mr. Chappell was right."

James H. Daniel, another witness for the proponents, testifies in substance that he had known Mr. Chappell for about four years, and had lived about five years some two miles from him, and one year one mile; that he saw Mr. Chappell during his last illness three or four times, and saw him last on the Tuesday night previous to his death, and staid with him all night; that he had some conversation with him at that time, and that he seemed to talk to witness with as good a mind as he ever

knew him to do; that witness knew the Trents; and in answer
to a question as to the relations between the Trents and Mr.
Chappell, he said: "When I was with them they seemed to
regard each other as one family, as well as I know; mighty
peaceable family; got along well together."

James H. Oliver, another witness, who was a wheelwright
and shoemaker, and lived not over a mile and a half distant
from Mr. Chappell, was asked whether he had ever heard Mr.
Chappell say anything about his feelings toward his blood re-
lations, and he answered: "About the most I ever heard him
say was when I had done some mending; I do not recollect
the year, but a good while ago; I did some shoe mending for
Mr. Joe Chappell and I did mending for Dick, and when I
brought the bill in he said, 'I will settle this with you as I told
you I would, but,' he said, 'do not have any more done for Joe;
I won't pay any more;' that was all that was said at that time
that I recollect of. Afterwards I was up there one day, or the
old man was at my house, he used to come to my house very
often and sit and talk; I asked him how his brother was, and
it was shortly after Mr. Elam went up there; I saw him and
knew him when he passed and I thought may be he had heard;
he said he did not know how he was getting on; he reckoned
he was getting on well; I said I reckoned you would hear from
him through Mr. Elam; no, he said, Mr. Elam had come up
for money; he had been maintaining Joe, but he was not going
to maintain him any longer, and so I asked no more questions
about it. And when asked how Mr. Chappell regarded Ned
and Eliza Trent, the witness answered, "He always was very
fond of them, and Ned, after Mrs. Trent died, he was talking
of leaving and I concluded I would let my son go if Ned left,
and he and I would undertake the business; I saw the old man
and he said he was in hopes that Ned would not go, and we
pretty much agreed on our bargain if Ned would not stay, and
he hoped to keep Eliza; he said they were good children and
good to him; he spoke about Ned's mother, and when she died

he told her that he intended to take care of Eliza as long as she lived, and he would do it. That was about all that was said. I did not ask any questions about what he intended to do."

James Weber, another witness, testifies that he had known Mr. Chappell about twenty-five years, and for ten or fifteen years he had lived about a mile and a half of him; that he saw Mr. Chappell during his last illness several times, but did not remember exactly when; that he did not have any conversations with him when he saw him, as witness saw he was weak and it hurt him to talk and witness said very little to him, but Mr. Chappell always told witness he was very glad to see him and asked witness how all were at home, and particularly witness' " old lady, as he knew she was in bad health." And being asked what was the relationship between Mr. Chappell on the one side and the Trents on the other, the witness answered, " They were just as one family, particularly fond of each other; they were just as good to him and took as good care of him as if they were his own children. I have heard him talk of them many a time and their mother; he did not think there was such a woman in the world: she died about three years ago—before Mr. Chappell."

Then comes Eliza Trent, one of the beneficiaries. Her testimony is to a large extent but a repetition of that of Ned Trent as to what occurred after the arrival of Dr. Nelson at Mr. Chappell's, on the occasion when the will was written, and just before the writing thereof. Much of her testimony is devoted to explaining the terms of the contract between Mr. Chappell and her father, to which Ned Trent succeeded on the death of her father; and much more of her testimony is immaterial to the question under consideration.

However, in speaking of the relations existing between her father and mother and Mr. Chappell, she says: " When my father and mother lived with Mr. Chappell they lived pretty much as one family together: that Mr. Chappell furnished them for the table meat and bread and cows, and my mother

kept the house and furnished everything else—furniture for
the house and other provisions except meat, bread, and milk.
We furnished the furniture for his room; my mother looked
after his clothes as long as she lived, and I looked after them
afterwards. We did not have any servant on the premises at
the time of his death. I was attending to the household duties;
my brother married, but I attended to the house as if he was
not there." When asked what she did about the household
during her mother's lifetime and afterwards, she answered:
" I did pretty much all the cooking, milking, cleaning up, and
kept house and everything, and Mr. Chappell was as a father,
as you would say, in the house." When asked how Mr. Chap-
pell treated Ned when he was a small boy, she answered:
"Just as if he was his own son; he would take him around
and show him places to interest him; he would take him to
ride, and tied him up behind him to ride when he was too
small to hold on; he would show him little interesting things
which he thought would amuse him about the place—stock,
&c." * * * Again, she was asked: "Did Mr. Chappell
ever in his lifetime make any promise that he was going to
provide for you or your brother by will?"

A. "When my mother died I was disturbed; all he said
was that we need never suffer."

Q. "And so far as it comes to your knowledge, he made no
promise to you or your brother that he would ever make any
special provision further than you state?"

A. "No, sir."

Moreover, on her cross-examination, Eliza Trent effectually
puts to rest the much paraded question respecting the horse
furnished by Mr. Chappell for Ned Trent to ride. She says
the horse was furnished three or four years before Mr. Chap-
pell's death, and that during that time Ned was managing the
farm; that it was a tolerably large farm, 1,200 acres or so;
that Ned did not manage all of it, part thereof being rented

out; and that after Ned became manager Mr. Chappell furnished him a horse.

This was certainly a sensible and economical arrangement on Mr. Chappell's part, which enabled his overseer, Ned Trent, to overlook so large a farm with greater expedition than on foot, and thus save and devote to actual farm work much valuable time. At all events, this explanation by Eliza Trent effectually precludes all idea of the furnishing the horse evinced Mr. Chappell's devotion to Ned Trent, and aids in accounting for this strangely unnatural, unjust and unexplained will.

Again, Mr. Chappell died on Saturday, and on the following Monday his brother, the appellant, Josiah Chappell, in company with Mr. Ingham, arrived at his dead brother's late home and remained there with the Trents until the succeeding Wednesday morning. And it is an uncontroverted fact that Dr. Nelson, when the pretended will was executed, sealed it in an envelope, handed it to Eliza Trent, and told her to put it away or take care of it. Eliza Trent says she saw Mr. Joe. Chappell and Mr. Ingham who came there on Monday after Mr. Chappell died, and that they staid until Wednesday morning. Being then asked if she said anything, either to Mr. Ingham or Mr. Joe. Chappell about this will, she answered: "I do not think they asked."

Q. "And you never told them anything about it?"

A. "No, sir."

Q. "They were there until the Wednesday morning? You had the will?"

A. "Yes, sir; I was not authorized to show it; the paper was sealed in an envelope."

Notwithstanding this very singular statement, it clearly appears from the testimony of C. H. Terrell, one of the subscribing witnesses, that Ned Trent handed him the will not later than Tuesday morning, and that he [Terrell] took it with him to Lynchburg that day, and had it at Maj. Kirkpatrick's office at the time of the conference with him before referred to. It

follows, therefore, that, whilst Mr. Joe Chappell was at the late home of his brother, and the guest of the Trents, the sealed envelope was broken open and the will delivered to Ned Trent, by whom it was in turn delivered to Terrell, who took it with him to Lynchburg; and in that time Terrell had made at least one copy of the will, which he handed to Mr. Joe Chappell on his return from Lynchburg on Tuesday afternoon. And yet Eliza Trent attempts to excuse herself for not saying anything to Mr. Ingham and Mr. Josiah Chappell about the will, upon the grounds (1) that she was not authorized to show the will; and (2) that the will was sealed in an envelope; when, in fact, she had broken, or had permitted the sealed envelope to be broken, and the will had passed, through the hands of Ned Trent, into the custody of Terrell, and had been used by him as before stated. It is, therefore, not true, as stated by her, that she had the will during the stay of Mr. Ingram and Mr. Joe Chappell, and that she was not authorized to show it, because it was in a sealed envelope; but it is true that it was handed to her sealed up, with directions to put it away, or to take care of it; which directions she disregarded by breaking it open, or permitting it to be done, and the will to pass into hands to which it had not been intrusted.

Finally, as if to give a finishing touch to this class of testimony, resorted to for the purpose of showing Mr. Chappell's dislike of his blood kin, his love and affection for the Trents, and that the pretended will is in accordance with his previously expressed intentions, Mrs. Overstreet, a sister of Ned and Eliza Trent, a sister-in-law of Crank and Terrell, the attesting witnesses, and a widow living with said Crank, is introduced, and, in answer to questions, she, under very peculiar circumstances, makes some most remarkable disclosures.

It seems from her statement that she was at Mr. Chappell's on the 25th day of March, 1890, the day on which Ned Trent was married to the daughter of one Bartholomew Gaddy; that Mr. Chappell wanted a button sewed on his pants that he

might wear them the next day when Ned was to bring his bride home, and that, in his dilemma, he called on Mrs. Overstreet to do him the service of sewing on the button, which she did; and, while she was performing this service, it seems that Mr. Chappell, a remarkably reticent man, both in respect to his own affairs and those of his family, completely unbosomed himself to her. She was asked:

" What were the relations that existed between Mr. Chappell and Mrs. Trent and Ned ? "

A. " They were always kind of affectionate as he could be, both they to him and he to them."

She was then asked this question: " Did you ever hear Mr. Chappell say anything about his feelings towards his own kindred ? "

A. " Yes, sir; it was in March last time I heard him speak of it—the March before he died in June; he brought a pair of pants to me and asked me to sew a button on, and I was sewing, and he began saying how bad it was not to have good clothes, and said he was not able to buy them, and I said, ' Yes, Mr. Chappell, if you want them,' and he said, ' You know how much money I have lost and paying Joe's board.' He says: ' I have paid the last cent I ever intend he shall have; they have threatened to carry him to the poorhouse, and he may go and die there.' Those were the words of Mr. Chappell, and he looked at me and said: ' You think it is harsh, but if you had a brother like Joe, and he treated you as he has treated me, you would not blame me'; and I have heard him say that when they were both boys he treated him bad; Mr. Dick Chappell was the elderest."

On cross-examination this witness was asked:

Q. " Did he tell you the bad treatment his brother had bestowed on him ? "

A. " Not that day; but I have heard him tell it many times that Joe beat him, when he was young, with the tongs."

This story is, upon its face, too improbable to be believed,

and in the light of the uncontradicted evidence of Josiah Chappell himself, a very full reference to which has already been made, the whole story is utterly unworthy of credit. From the statement of Josiah Chappell, which bears the very impress of consistency and truth, it may readily be seen that his life and actions were so intimately interwoven with the life and actions of his elder brother, Richard T. Chappell, that it would be next to impossible to relate the history of the life of the one without that of the other. In their early boyhood they were put at a boarding school together. Later, when their father had died, leaving them both comfortable fortunes, and when they grew to manhood, Richard, the elder, went to Bedford, took charge of his estate there, and lived on it, having an overseer named Oglesby. The younger brother, Josiah, remained near the old homestead, in Charlotte county, married into the Armistead family, and formed a partnership with a Mr. Fuqua and engaged in the mercantile business.

Not long after he commenced operating his estate in Bedford, Mr. Richard T. Chappell became involved in a difficulty with his said overseer, and beat him so severely that he was sued and had to respond in damages to the extent of $3,000. This loss so prayed upon him that it dethroned his intellect. He abandoned his estate in Bedford, returned to the old neighborhood in Charlotte, where he roamed around, night and day, threatening violence to many of the neighbors, including his own aged mother. He was taken in hand by authority of law, and, it being deemed best for him, and his estate being ample, he was sent to a private asylum in Philadelphia, where he remained two years or more, and then made his escape and returned to the old neighborhood in Charlotte county, but still the victim of his severe mental malady, and still breathing dire threats against his old neighbors, who, feeling insecure, desired that he be rearrested and sent back to the asylum. But at this juncture his brother, Josiah, interceded in his behalf, proposed to take charge him, put him in his store, and

Opinion.

make the effort to restrain, quiet and restore him. This arrangement was acceded to, and it worked so well that it was not very long before Mr. Chappell was so far restored as to dispel all apprehensions of danger theretofore entertained.

During the confinement of Mr. Chappell in the asylum, and afterwards, as long as his malady lasted, his brother, Josiah, acted as his committee, and, as such, made his regular annual settlements, there not being an intimation that he did not in every particular faithfully discharge his trust. In the meanwhile Fuqua, the partner of Josiah Chappell in the mercantile business, failed and the business was closed. Josiah Chappell then gave his brother Richard a home under his own roof, where the latter remained for a number of years, and until long after he had recovered from his mental malady. After he had so recovered, and had resumed the control of his affairs, he still seemed averse to returning to Bedford; and he urged his brother, Josiah, to continue to direct the management of his estate in Bedford, which the latter did for some time, and there was not an intimation that he was not true to his brother's interest during this period. During this period Josiah Chappell was in comfortable circumstances, and was extending to his older brother all the comfort and aid suggested by duty and brotherly affection. But Josiah had become security for his friends, his partner in business had failed, and he had become embarrassed. Then came the civil war, the destruction of his slave property, the insolvency of his friends for whom he was surety, and the result was that, after the war, he was forced into bankruptcy, surrendered everything he possessed, and, in his old age and feebleness, he was left to shift for himself, receiving, for a few years, the small pittance of one hundred dollars per year from his brother Richard for his board at Mr. Elam's, in Charlotte. Such in substance are the facts brought to light by the testimony of Josiah Chappell; in all of which we can but see the dutiful devotion of Josiah to his older brother during the period of his affliction, and the mutual trust,

confidence and affection between the two brothers until the Trents came between them.

Moreover, after the war, and after Mr. Chappell returned to his estate in Bedford and employed the elder Trent as his overseer, Josiah Chappell, then poor and dependent, did not have the means with which to pay horse hire, and could not visit his brother in Bedford as often as he desired, but he for some years managed to visit him frequently—sometimes remaining a few days, and at other times as many weeks. During these visits he worked on the farm as if he had been a common hireling. He cut timber, mauled rails, built fences; he worked in the crops, looked after and fed the stock, cows, &c., and even cut and prepared wood for the Trents to cook with. If, in the least particular, the facts thus disclosed by Josiah Chappell had been untrue it was easily susceptible of proof; but no effort is made to disprove any statement of his, and his statement must be taken as undeniable. There seems to have been a system of espionage on the life, habits, and conversations of Mr. Chappell. Every conversation of his, whether with officers of the law visiting him on official business, casual visitors, and others, except his real neighbors, is overhauled and the most trivial things—" trifles light as air "—are raked together and thrust into the record as evidence that Mr. Chappell disliked his kin, was all love and devotion to the Trents, and that the will in question was made in pursuance of a long-cherished design on the part of Mr. Chappell. Upon this subject counsel for the propounders became so enthusiastic as to lose sight of the solid facts in the case, and say : " The testator's relations and feelings towards the Trents by one unbroken chain of testimony, in which there is no dissenting voice, were of the kindest and most paternal nature, creditable alike to both, and continued from father to son, from mother to daughter. The neighbors expected, from their relations, that he would give the Trents his estate. Close in his counsel, reticent about his affairs, as he always was, he still had intimated to friends, in

no way connected with the Trents, that he had the purpose to provide for them. He told John L. Oglesby vaguely, that he meant to provide for old Mr. Trent. He told Wm. P. Burks that Ned would get a considerable part of his estate. He cautioned both to keep quiet about it, which was well. He told Mr. Trent on his death-bed that Mrs. Trent and Eliza should never want for anything. He said when Eliza was grieving for her mother's loss that *he* would take care of her. He intimated to Terrell, Edward Trent's brother-in-law, when he found the young man wished to strike out for himself, that it would be the best for him not to go."

These conclusions of counsel are not, in most material respects, sustained by the real facts. We fail to discover in the record any evidence whatever that seriously tends to show that Mr. Chappell's neighbors, or any one of them, ever for a moment expected Mr. Chappell to give his estate to the Trents. None of them say so. Ned Trent himself certainly expected nothing of the kind; for, in his statement of the conversation between Mr. Chappell and himself just before Dr. Nelson was sent for to fix the matter, he says that Mr. Chappell proposed to make some provision for him and Eliza—not to give them his entire estate—and, as already shown, when Dr. Nelson arrived and made known the object of his visit, Mr. Chappell was utterly unconscious of the alleged conversation between him and Ned Trent so short a time before.

Dr. Nelson expected nothing of the kind; for he opened his interview with Mr. Chappell by saying: " I came over to see you about making some provision for the Trents," and receiving no response, he then proposed a deed conveying them a portion of his estate, and still getting no response, he then proposed assigning to them one of his certificates of deposit, to which Mr. Chappell is said to have responded, "I think not"; and then followed Dr. Nelson's proposition in respect to the will, which, as already shown, was the will, not of Mr. Chappell, but of Dr. Nelson disposing of Mr. Chappell's estate.

The only neighbor of Mr. Chappell who intimates anything of the kind, is Terrell, one of the subscribing witnesses, whose statement, in substance, is that he would not have been surprised at any time at Mr. Chappell making a will in favor of Ned and Eliza; but Terrell admits that he never heard Mr. Chappell intimate any intention to make any such will, or any will whatever. As to Mr. Chappell's reply to the inquisitive suggestion of Mr. William P. Burks, and the remark made by Mr. Chappell to Terrell when Ned Trent had determined to leave Mr. Chappell and strike out for himself, they are too utterly insignificant to require further comment.

Again, counsel say: " He " (Mr. Chappell) " said when Eliza was grieving for her mother's loss, that *he* would take care of her." Such is not the statement of Eliza Trent herself. In answer to the question : " Did Mr. Chappell ever in his lifetime make any promises that he was going to provide for you or your brother by will ?" she answered : " When my mother died I was disturbed; all he said was that we need never suffer."

It is doubtless true, as claimed by counsel for the propounders, that Mr. Chappell was urged, during the lifetime of old Mr. Trent, to make some provision for him, and it may be true that he intimated a purpose, as to John L. Oglesby, to make some provision for the old man ; but what possible relevancy or influence can all that have to the one question of prime importance in the present case, which is, was the will in question the offspring of the free and unrestrained volition of the alleged testator? In other words, was Richard T. Chappell, at the time of its procurement, a free and capable testator?

Again, in their over wrought zeal, counsel say: " Add to all this that it is shown by an absolutely unanimous array, that the domestic intercourse, the personal relations, the kindness, service, and duty in sickness and in health, were those which obtain between a grand-father, or father, and good and dutiful children, every way worthy of his love," &c. All this is but

a splendid exaggeration, unsupported by the real facts of the case, and having no existence save in the heated imagination of the advocate. Mr. Chappell, as was well said by one or more witnesses, had little, if any, love for anything except his money or property. Notwithstanding all the gush of witnesses about his love and affection for the Trents, and especially Ned and Eliza, Mr. Chappell, so far as shown by the record, never gave to any one of them a single copper's worth of anything. He was a man of ample fortune, but, even in his last sickness he did not furnish Eliza Trent the least help in performing the coarse and heavy drudgery of her house work; nor did he furnish any such help at any time after the death of Eliza's mother. Where there is such love and devotion as that attributed to Mr. Chappell, it is sure to be demonstrated in some substantial way. Ned Trent was simply Mr. Chappell's overseer. He superintended the work on the farm and worked thereon as a common laborer. The relations between Mr. Chappell and him were those of employer and employee, or more strictly speaking, that of principal and agent, or master and servant, nothing more, nothing less. Eliza Trent, on the death of her mother, succeeded to the duties and obligations of housekeeper. She did, unaided, the milking, cooking, washing and other drudgery incident to housekeeping. Such were the social and domestic relations existing between Mr. Chappell on the one hand, and Ned and Eliza Trent on the other, and the effort on the part of the latter to change or elevate, by comparison, the relations thus existing to those of a fond grand-father, or father, and loving, dutiful children, is not warranted by the facts, and is simply absurd.

Again, the record contains much evidence clearly evincing that neither Dr. Nelson nor Crank and Terrell, the attesting witnesses, believed the paper in question to be valid as the last will and testament of Richard T. Chappell. This is shown (1) by their efforts to conceal the existence of the alleged will; (2) by declarations to the effect that there was no will; and (3) by

their consulting counsel in order to determine whether or not the paper should be offered for probate.

On the day previous to Mr. Chappell's death, Thomas Crank and Terrell were sitting under the shade trees in front of Mr. Chappell's house, when Crank asked Terrell if Mr. Chappell had done anything with his property, had made a will, or anything of that sort, and Crank says that Terrell's reply was, "Not that anybody here knows." On his cross-examination, Terrell's attention was called to this conversation. At first he disclaimed seeing Crank on that occasion, but when asked the question, "Don't you remember you and he sitting under the trees in the yard on Friday, the day before he (Mr. Chappell) died, and that he asked you whether Mr. Chappell had done anything with his property?"

A. "No, sir; I remember he asked me the question indirectly, but I think it was on Sunday, the day on which Mr. Chappell lay a corpse; we were sitting under the trees, and Mr. Crank said to me, 'I wonder if he had done anything with his property,' or something to that amount. I do not know that I can recollect the words, and I replied, 'If he had he kept it mighty quiet,' and changed the conversation."

Q. "Did not you say if he had done it, nobody knew anything about it?"

A. No, sir, I did not. He asked me indirectly and I answered him evasively."

Q. "Why did not you tell him the truth?"

A. "I had not been authorized to tell people he had made a will, and did not want to be a busy-body. I tried to tell him as politely as I could. I did not care to talk."

Q. "What did you tell him?"

A. "If he had, he kept it mighty quiet."

Q. "After Mr. Chappell was dead and gone, why should you be so reticent about it and so particular?"

A. "Because I did not care to publish it. I thought it was for the court to publish a will."

Q. "You wanted to keep it until you gave it to the court?"

A. "Until somebody asked questions who had some right."

It seems, however, that Terrell had no such scruples when he obtained possession of the paper, took it to Lynchburg, and exhibited it in Major Kirkpatrick's office, and afterwards delivered a copy of it to Mr. Josiah Chappell. But Terrell says his answer to Thomas Crank's question as to what disposition, if any, Mr. Chappell had made of his property, was, "If he had, he kept it mighty quiet," while Crank says his answer was, "Not that anybody here knows." It is not which is correct, the difference being as to phraseology merely; and whether the one or the other be correct, the meaning is the same, and could only have been intended to convey the idea that Mr. Chappell had made no will; and yet the paper in question had been executed on the preceding Tuesday, and Terrell was one of the subscribing witnesses.

Again: Terrell says Crank's question was indirect and his answer was evasive. We fail to discover anything of the kind. The question was a plain, direct inquiry as to whether Mr. Chappell had made a will disposing of his property, and the answer, to the effect that there was no will, was equally plain and direct.

On the Monday or Tuesday after the Mr. Chappell's death, Terrell was passing the house of Joshua Rucker, an old neighbor and friend of Mr. Chappell, when Rucker hailed Terrell, and, after the usual salutations, asked him if Mr. Chappell had left a will, and that Terrell replied, "No, if he has, Dr. Nelson knows all about it." And Mr. Rucker states that he communicated to Dr. Nelson what Terrell had told him, and that he asked Dr. Nelson if Mr. Chappell had left a will, and that Dr. Nelson's reply was that Mr. Chappell had made no will, and the property would go to his brother and two half sisters. Mr. Terrell admits that Mr. Rucker asked him the question as above stated, but attempts to modify the effect of his answer by stating that his response was, "If he did, I reckon Dr. Nel-

son knows all about it." Here again the difference is merely as to phraseology, the evident intention being to create the impression that there was no will; nor can the answer be differently interpreted.

It will be remembered that the paper in question was executed on Tuesday and that Mr. Chappell died on the following Saturday; that one of the attesting witnesses, Crank, had been with Mr. Chappell from about 9 o'clock of that day and remained there until the alleged will was executed, when he went home and did not again see Mr. Chappell during the remaining four days of his life; that Terrell, the other attesting witness, who says his presence on that occasion was purely accidental, though it was shown that he was there by reason of his solicitude about Mr. Chappell's will—we say that he (Terrell) remained at Mr. Chappell's until late that evening, when he went home. On Wednesday morning, the day after the execution of the paper in question, Terrell was passing along the road from his house to Mr. Chappell's. Mr. Dibrell Oglesby, with Hannibal Walker, a colored man, and others, were in a field by or near the road along which Terrell was that morning passing, engaged in working tobacco.

On his cross-examination, Terrell's attention was called to the occasion, and he was asked: " Mr. Terrell, do you remember on the day after this will was written, or the next day between the time that the will was written and Mr. Chappell's death, that you, in passing Mr. Dibrell Oglesby's, and when they were in the grounds at work, they hailed you and had a conversation with you in regard to Mr. Chappell ? "

A. " I do not; I have no remembrance of it whatever, and I do not believe that they ever mentioned the subject to me."

Q. " Do you not remember having a conversation there with Dibrell Oglesby in the presence of a colored man by name of Hannibal Walker ? "

A. " No, sir; I do not."

Q. " Do you not remember that Mr. Oglesby asked you how

Mr. Chappell was, and that you told him that you had been there the evening before—as I understand it, the evening the will was written; this was on Wednesday that you had been there the evening before, and that he was as low as a man could be, and that he did not know you or anybody else, and was out of his mind, or did not have any mind, and that you would not be surprised to find him dead that day?"

A. "I never made any such statement to Mr. Oglesby."

The witness evidently anticipated what was coming, and bruskly answered that he had never had any conversation with *them* on the subject, before anybody's name, except that of Mr. Oglesby, had been mentioned, and before the subject of inquiry had been disclosed. But be this as it may, Dibrell Oglesby and Hannibal Walker both swear positively as follows:

Dibrell Oglesby: "Yes, sir; Mr. Terrell was passing; I was out in the tobacco ground myself, and three other persons; Hannibal Walker and we were working tobacco, and Hannibal called my attention to Mr. Terrell passing by, and I hollered to him and told him 'Good morning.' I asked him how was Mr. Chappell the last time he saw him; he says, 'I left Mr. Chappell's house last night about dark, and he was just as low as he could be; I would not be surprised to find him dead when I get there.' I said, 'Did Mr. Chappell know anybody?' and he said, 'No, he did not know anybody, and had not known anybody for several days.' I said I was thinking of going down to see the old gentleman, but if he does not know anybody, it is hardly worth while. I locate that this was on Wednesday, because on Thursday Albert Fowler went for a preacher, but did not get one, and I repeated the conversation in the field where they were all at work that day, and that was the Thursday before he died Saturday. He told me he had left there the evening before; that was Tuesday."

Hannabal Walker: "Mr. Terrell was passing, and I called his [Mr. Oglesby's] attention, and they passed good morning,

and Mr. Oglesby said, 'when was the last time you was over there,' [at Mr. Chappell's], and he said, 'I left there last night about dark, and Mr. Chappell was just as low as a man could be;' and Mr. Oglesby asked him if he knew anyone, and he said no, that he had not known anyone for several days; Mr. Oglesby said, 'I was thinking of going over to see the old man, but if he does not know anyone it is no use going;' that conversation occurred on Wednesday, and Mr. Chappell died on the following Saturday."

This testimony is in perfect accord with that of several other witnesses, all of whom state positively that Mr. Chappell, for some eight or ten days prior to his death, was incapable of transacting any business. But Terrell denies outright having had the conversation with Dibrell Oglesby, testified to by him and Hannibal Watkins, and they and the others, under the statutory rule, § 3484, Code 1887, must be pushed to the wall with the stigma of discredit necessarily affixed to them. Surely it is an unjust and oppressive rule that puts it in the power of any court or jury to sanction such a result. But such is the prescribed rule, and this court must enforce it by disregarding all these disinterested witnesses introduced by the contestants, the appellants, and giving full faith and credit to the statements of Terrell, who could but feel a deep interest in the cause of the beneficiaries, Ned and Eliza Trent, his brother-in-law and sister-in-law.

Counsel for the propounders, in their printed argument, give a numerical statement of the witnesses introduced by the defendants in the issue, the appellants here, and also a brief, though very imperfect, summary of their testimony. It is a singular fact that in referring to Dibrell Oglesby and Hannibal Walker, whose very important statements are above set out at large, summarily disposes of them as follows: " 5th. Dibrell Oglesby saw him (Mr. Chappell) once, in the daytime, the week before the will was made; gives no opinion." " 6th. Hannibal Walker, a negro, called to contradict Mr. C. H. Terrell."

This mode of treating these witnesses is not fair. Their statements speak for themselves, though lost to the cause, and their statements are sustained by an overwhelming array of the true neighbors and friends of Mr. Chappell, in no way connected with him or with the Trent family, and without any interest that could even tempt them to misrepresent the facts. However, in the cross-examination of Hannibal Walker an incident occurred which is worthy of notice. Counsel for the propounders seemed rather disposed to scout as unseemly presumption the interest manifested by this humble colored man in the health and well-being of Mr. Chappell, and he was asked this question :

" You were particularly anxious to find out how Mr. Chappell was? Were you a friend of his ? "

A. " My mother belonged to him and I was raised there, and every time he saw me he seemed to appreciate me."

There is in this answer that touch of true manhood and sensibility which every honorable man admires as a priceless jewel, whether its possessor be a white man or a black man ; and it carried with it a gentle but telling rebuke, of which counsel seem not to have been insensible, for that style of examination was at once abandoned.

Now, as to Dr. Nelson again. On his cross-examination he was asked :

" Did not Mr. Coffee ask you after this will had been made, in the afternoon at the postoffice, if Mr. Chappell had made a will, and did you not reply he had not; moreover, Mr. Chappell had not been in a condition to make a will for eight or ten days ? "

A. " Mr. Coffee asked me a question and I answered it evasively, neither affirming or denying there was a will, and Mr. Coffee does not assert that. I am very positive I never said that Mr. Chappell had not been in a condition for eight or ten days to make a will."

Q. "Did not you ride from the postoffice for some distance with Mr. Morris H. Dinwiddie?"

A. "Yes, sir."

Q. And did you not, during this conversation with Coffee, and in the conversation with Mr. Dinwiddie, remark to him that Coffee was mighty interested about Mr. Chappell's will?"

A. "I did, sir, because he had repeatedly asked about it."

Q. "And did not you tell Mr. Dinwiddie that Mr. Chappell had no will to make?"

A. "I did not; and if he asserts that, he asserts what is an untruth."

Q. "And if he wanted to give Miss Trent or Ned Trent anything he could have given them one of the certificates of deposit?"

A. "I did not; I never said anything to him; I wish to state what occurred at the postoffice; I came to the postoffice and some one asked me (which Mr. Coffee had asked me on several occasions) some question bearing on Mr. Chappell's making a will, and I was a little tired of it, and thought it a piece of impertinence anyway, because I thought it was not right to disclose the contents of the will until it was offered for probate, and he asked the question (or some other person by the store) had Mr. Chappell made a will; deeming it an impertinent inquiry, I answered evasively, neither affirming or denying: 'Do you suppose, I having been Mr. Chappell's friend and physician for thirty years, he could have made a will without my knowing it?' simply evasive, that was my purpose, and was my only purpose as my memory serves; Mr. Coffee made himself officious in regard to Mr. Chappell's will."

Such is Dr. Nelson's statement as to whether there was a will. He admits that his answer to the question was: "Do you suppose, I having been Mr. Chappell's friend and physician for thirty years, he could have made a will without my knowing it?" But he seeks to break the force of what he

thus admits by saying he deemed the question "impertinent, and that his answer was simply evasive, neither affirming or denying the existence of a will." This will not do. The question put to him was a plain, direct, and most natural one, and his answer was equally direct, clearly importing that there was no will, nor is it conceivable that the answer was intended to convey any other idea. He says he didn't think it right to disclose the contents of the will until it was offered for probate. Very well. But the question put to him did not seek the contents of the will, but only to ascertain whether there was a will. There was no necessity for evasion. He could, with the utmost propriety, have answered, "There is a will, but I do not feel authorized to make known its contents until it is offered for probate." This would have silenced inquiry, and all would have abided such an answer. But be this as it may, both Mr. Dinwiddie and Mr. Coffee concur in saying that in answer to Mr. Coffee's question, Dr. Nelson said : " Henry, Mr. Chappell has made no will that I know of; I being his friend and physician for thirty years ; if he had done so I would have known something of it, and moreover, he had not been in a condition to make a will for eight or ten days."

Marshall Crank, a witness for the propounders, who heard the conversation between Mr. Coffee and Dr. Nelson, fully corroborates the statements of Mr. Dinwiddie and Mr. Coffee, except that he does not remember that Dr. Nelson said that Mr. Chappell had not been in a condition for eight or ten days to make a will. He does say, however, that Dr. Nelson did say : " Henry, Mr. Chappell has made no will; if he had, I being his physician and friend and neighbor for the last thirty years, would have known it." Dr. Nelson, however, denies saying there was no will, and denies saying that Mr. Chappell had not been in a condition for eight or ten days to make a will. The result is that to this extent the testimony of these witnesses must, under the arbitrary application by the jury, of the rule above referred to, be rejected as unworthy of belief.

But, take Dr. Nelson's own admission that he did say, " do you suppose, I having been Mr. Chappell's friend and physician for thirty years, he could have made a will without my knowing it," and it is enough. Its plain meaning is that Mr. Chappell had made no will, and all effort to explain away this palpable meaning is simply idle. On Sunday, the day Mr. Chappell was burried, and when returning from the grave to the house, a witness asked Dr. Nelson who would get Mr. Chappell's property, and the reply was that his brother and two half sisters would · get it. A very short time thereafter we find Dr. Nelson and Mr. Terrill conferring together under the shade trees about the old Chappell house. In that consultation, Dr. Nelson suggested the importance of a full conference betwen himself, the beneficiaries—Ned and Eliza Trent—and Crank and Terrill, the attesting witness, when Terrill proposed that the conference, the admitted object of which was to determine what course should be taken with respect to the will, and whether it should or not be offered for probate, be held at his house, and it was accordingly held there. When these facts, showing a pre-arranged purpose to conceal the existence of the will, are taken in connection with the facts immediately attendent upon the execution of the pretended will, it is a matter of profound surprise that the jury should have found a verdict in favor of the pretended will. That the jury did so find ·can only be accounted for upon the theory that they were mislead by the action of the court in refusing certain instructions asked for by the defendants in the issue, and in giving in lieu thereof certain other instructions asked for by the plaintiffs in the issue.

The instructions have already been set out in the statement of the case and they need not be repeated. In fact, they need only be considered in a general way, so as to indicate in what respects they were misleading and, therefore, erroneous.

I. The defendants in the issue asked for two instructions, designated respectively as " C " and " D "; to both of which

the plaintiffs in the issue objected and offered in lieu thereof instructions 6 and 7; and the court sustained the objection of the plaintiffs in the issue and gave said instructions 6 and 7; and thereupon the defendants in the issue moved the court to give as a substitute for said instruction the instruction "E" offered by them; but the court overruled the motion and refused to give said instruction "E" in lieu of said instruction "6". The action of the court in these respects constitutes the subject of bill of exceptions No. 1, taken by the defendants in the issue.

The first instruction ("C") asked for by the defendants in the issue, asserts the simple and undeniable proposition that "undue influence is any means employed upon and with the testator by which, under the circumstances and conditions by which the testator was surrounded, he could not well resist, and which controlled his volition and induced him to do what otherwise would not have been done."

If the controlling question in the case had been whether or not the will in question had been obtained by "undue influence," then this instruction would have been absolutely without fault; and inasmuch as the bill charges both want of testamentary capacity and "undue influence," and the instruction being addressed to the latter subject, it should have been given as asked.

II. The second instruction ("D") says: "When an old man eighty-five years old, of greatly impaired health and enfeebled mind, away from his next of kin and in the custody of persons of no kin, is induced to make a will giving to such persons his entire estate, the law requires that such persons must clearly prove that the will was the free and voluntary act of the testator and an intelligent expression of his wishes respecting the disposition of his property."

This instruction accurately describes the situation and surroundings of the testator, at the time of the execution of the

pretended will; it correctly states the law, and should also have been given as asked.

Instruction " 6," given at the instance of the plaintiffs in the issue in lieu of instruction " C " asked for by the defendants in the issue, contains four propositions, in which there is much laid down as law, which is frequently found in adjudged cases as well as in the books of text writers, but which is not strictly applicable to the circumstances of the case in hand. For instance, the first of these four propositions is that what is undue influence such as to overcome the will or control the judgment of the testator, is a question that largely depends upon the circumstances of each case, chief of which are the dispositions contained in the will, the situation of the testator and his mental and physical condition at the time the will was made.

This language, to the average juror, is but a glittering generality tending rather to confuse than to aid a jury in the investigation of the particular case in hand. The language is intended simply to announce the universally admitted fact that no general rule, applicable alike to all cases, can be formulated.

The second proposition is that, " influence to vitiate an act must amount to force and coercion ; obstructing free agency; it must not be the influence of affection and attachment; it must not be the mere desire of gratifying the wishes of another, that might be a very strong ground in support of the testamentary act."

Under the peculiar circumstances of this case, the language " influence to vitiate an act must amount to force and coercion," is inappropriate and calculated to mislead. Undue influence is often defined in the books as that degree of influence which amounts to force and coercion, but more frequently, or certainly with greater accuracy, as that degree of influence which destroys free agency. " *Coerce*," says WEBSTER, " had at first only the negative sense of chocking or restraining by force; as, to *coerce* subjects within the bounds of law. It has now

gained a positive sense, viz., that of driving a person into the performance of some act which is required of him by another; as, to *coerce* compliance with the conditions of a contract; to *coerce* obedience. In this sense (which is now the prevailing one), *coerce* differs but little from *compel*, and yet there is a distinction between them. *Coercion* is usually accomplished by indirect means, as by the operation of law or the force of circumstances. Threats and intimidation are very often resorted to. Physical force is more rarely employed."

The word *coerce*, to the ordinary mind not trained to nice distinctions, naturally carries with it the idea of physical force or threats of personal violence. Now, in the present case, it is not pretended that any physical force was applied, or any threats of violence resorted to. Then how natural it was for the jury, when told that " influence to vitiate an act must amount to force and coercion," that inasmuch as there was in this case no application of actual physical force, and no threats of personal violence, therefore the will in question is the spontaneous offspring of a sound and disposing mind and memory, and is, therefore, the true last will of the alleged testator. It is, to say the least, most likely that the jury took this view of the subject and were thus erroneously led to a verdict in favor of the will.

The third proposition contained in this instruction (6) is, that " there must be proof that the act was obtained by this coercion, by importunity that could not be resisted; that it was done merely for the sake of peace, so that the motive was tantamount to force or fear."

The first part of this proposition, that " there must be proof that the act was obtained by *this coercion*, that is, there must be proof that the influence exacted amounted to *force and coercion*, as asserted in the preceding proposition, simply intensifies the objectionable feature set forth in said preceding or second proposition. The language employed in the latter part of this third proposition in respect to importunity that could not be resisted

and that the act was done merely for the sake of peace, &c., when taken in connection with the antecedent language in respect to proof of coercion, is ambiguous, and is, moreover, obnoxious to the objection that it leaves out of view the first and all-important question of testamentary capacity, and assumes that the will is valid unless it be shown to have been procured by importunity that could not be resisted, or was made merely for the sake of peace. In other words, it is assumed, in effect, that the alleged testator was possessed of the requisite mental capacity to enable him to make a valid will, and upon that unwarranted assumption the argument is shrewdly suggested to the jury, that unless it be shown that the will was the result of importunities that could not be resisted, or was made purely for the sake of peace, then the paper in question must be upheld as the true last will and testament of Richard T. Chappell.

The fourth and last proposition contained in said instruction " 6 " is as follows :

" On the other hand, where the provisions of a will accord with the affections and previous declarations of the testator, and are such as might have been justly expected, these are facts tending to prove both testamentary capacity and freedom of action."

This proposition is open to the same objection as that considered in discussing the preceding, or third, proposition. It is, in effect, an argument in support of the theory attempted to be set up by the plaintiffs in the issue, to wit: that the will in question was not only a righteous and natural one, but the only one that could be made in conformity with Mr. Chappell's *affections* and *previous declarations*, and such as might not only have been justly expected, but was expected by all of Mr. Chappell's friends and neighbors. The proposition itself is based upon the erroneous assumption that the so-called will was made in pursuance of the alleged testator's affection for the Trents and in accordance with his *previous declarations*.

This view has been already met and refuted. Mr. Chappell's alleged affection for the Trents is but a myth. No *previous declarations* of his, tending in the least to indicate any purpose on his part to make any such will, or any will whatever, are proved. On the contrary, all his *previous declarations* were to the effect that "the law makes the best will," or "the law makes a good enough will for me." Nor is it proved that any neighbor or friend of Mr. Chappell expected him to make any such will. The direction contained in this proposition should not have been given to the jury. What is here said applies equally to instruction "7," given by the court at the instance of the plaintiffs in the issue, in lieu of instruction "D," asked for by the defendants in the issue.

The defendants in the issue asked the court to give instruction "E" as a substitute for said instruction "6," given by the court at the instance of the plaintiffs in the issue and in lieu of instruction "C," asked for by the defendants in the issue. This instruction ("E") is so badly punctuated as to somewhat mar and obscure its meaning, and is in one respect elliptical—it being obvious from the context that in the third sentence thereof, after the words "discretion or wish," the words "is overborne" are omitted and should be inserted in order to make the meaning clear. So understanding the instruction and correcting it in the respects mentioned, it is as follows:

"The court instructs the jury that to make a good will a man must be a free agent, but all influences are not unlawful; appeals to the affections or ties of kindred, to gratitude for past services, or pity for future destitution, or the like, are all legitimate, and may be fairly urged on a testator. On the other hand, pressure of whatever character, if so exerted as to overpower the volition without convincing the judgment, is a species of restraint under which no valid will can be made. Importunity which the testator has not the will or strength to resist, and to which he yields for peace and quiet, if carried to a degree in which the testator's judgment, discretion, or wish

is overborne, will constitute undue influence, though no force is used or threatened. In other words, his will must be the offspring of his own volition, and not the record of the wishes and desires of some one else; and in considering whether the testator's free volition had been overborne or controlled, the jury must consider his age, his physical and mental condition, and all the circumstances surrounding the testator."

This instruction, like all the others embraced in the bill of exceptions now under consideration, is addressed to the question of undue influence. It is clear and unambiguous in expression, and, as respects the question of undue influence, it states the law with unquestionable accuracy, and it should have been given. We are, therefore, clearly of opinion that the court below erred in rejecting said instructions C, D, and E, and in giving said instructions 6 and 7.

The defendants in the issue also asked the court to instruct the jury as follows:

" The court instructs the jury that no will is valid unless in writing and signed by the testator, or by some other person in his presence and by his direction, in such manner as to make it manifest that the name is intended as a signature, and moreover, unless it be wholly written by the testator, the signature must be made or the will acknowledged by him in the presence of at least two competent witnesses present at the same time, and such witnesses shall subscribe the will in the presence of the testator."

This instruction is in pursuance of the statute, and should have been given in the form in which it was presented; but the plaintiffs in the issue objected, and moved the court to add thereto the following:

" If a will has been signed by some other person in the presence of the testator, and by his direction, it is not required that such direction be in any particular form. It may be by the spontaneous direction of the testator, or by the suggestion of a third person accepted and adopted by the testator." There

was no possible necessity for, nor propriety in, making this addition. The statute covers the whole ground, and the instruction as asked for is in the language of the statute. The addition in question was manifestly calculated to serve as an argument to enforce the theory of the plaintiff's in the issue before referred to. The court below erred in giving it. This disposes of the second bill of exception of the defendants in the issue. The subject of the third and last bill of exceptions taken by the defendants in the issue, is the action of the court overruling this motion to set aside the verdict of the jury, upon the ground that the same was contrary to the law and the evidence. From what has already been said, it follows that the court below erred in this respect also.

The case necessarily turns upon the question whether the testator, at the time of the execution of the paper in question, was possessed of a sound and disposing mind and memory. It is a singular fact in this case, where all the material circumstances so conclusively show the want of testamentary capacity, that that subject is practically ignored in all the instructions given by the court. Upon this subject the jury should have been instructed in clear, strong, and unambiguous terms, that it must appear, by clear and convincing evidence, that the testator, at the time of the execution of the paper, retained sufficient *active mind and memory* to enable him to collect and arrange in his mind, *without prompting by others*, the particulars or elements of the business to be transacted, and to hold them in his mind a sufficient length of time to perceive at least their obvious relations to each other, and to be able to form some rational judgment in relation to them; and that, if he was unable to do this without prompting, he was incompetent to make a valid will. As was said by Chancellor Walworth, in *Clarke* v. *Fisher, supra:* "The general principles in relation to the capacity of a person to make a will are well understood. He must be of sound and discerning mind and memory, so as to be capable of making a testamentary disposition of his prop-

erty with sense and judgment in reference to the situation and amount of such property, and to the relative claims of different persons who are or might be the objects of his bounty." So, in *Dare* v. *Jackson, supra,* in charging the jury it was said: "That a disposing mind and memory is a mind and memory which has the capacity of collecting, discerning, and feeling the relations, connections, and obligations of family and blood."
\* \* \*

That Mr. Chappell did not, in the light of the controlling facts in this case, have a mind and memory capable of performing such functions is too clear to admit of doubt. It may be stated as an undeniable fact that there is not the slightest evidence that the idea of making any such will as that in question ever, for one moment, had a lodgment in the mind of Mr. Chappell. The whole scheme was conceived in the mind of Dr. Nelson, and was carried through by him without any intelligent consciousness or participation on the part of Mr. Chappell. Dr. Nelson swears positively that the will was made at his suggestion, in every particular, and that there was an entire absence of spontaneity on the part of Mr. Chappell. Moreover, Dr. Nelson had doubts—well founded and insurmountable doubts—as to Mr. Chappell's capacity to make a valid will. It is, then, perfectly clear that the alleged will is solely the result of Dr. Nelson's prompting, without any intelligent participation on the part of Mr. Chappell, and is, therefore, invalid and void.

Much is said in argument in vindication of Mr. Chappell's assent to Dr. Nelson's suggestions. It is undoubtedly true that a testator may adopt and act upon the suggestions of a third person; but this pre-supposes a testator possessed of a sound and disposing mind and memory, and has no application to a case like this, in which the requisite testamentary capacity is not proved to exist. When a free and capable testator adopts and acts upon the suggestions of a third person, it is just the same as if the suggestions had originated in his own mind. Much is also said in vindication of the formal

execution of the paper. It is true that the two subscribing witnesses, with Dr. Nelson and Mr. Chappell, were present together at the death-bed scene when the paper in question was executed; that the subscribing witnesses attested the paper right in front of him, and, as they say, Mr. Chappell was looking straight at them. But it is equally true that, when they were called in to attest the paper, Mr. Chappell did not even extend to them the ordinary greeting, when he had not seen one of them (Terrell) for some two days. Mr. Chappell uttered not even a word to them, nor they to him. He did not request them to attest his will, nor did either of them ask if he desired them to do so. They simply stood by and acquiesced in the pantomimic display being conducted by Dr. Nelson. This was not *presence* in the true sense. The word *presence*, as used in the statute, means *conscious presence*. *Baldwin* v. *Baldwin's ex'or, &c.*, 81 Va., 405; *Tucker* v. *Sandige, Curator*, 85 Va., 546. They were present and alive to what was going on; but how was it with Mr. Chappell? He was there, a dying man, and still breathing and living; but, in the light of all that transpired at the execution of this pretended will, he was no longer possessed of the essential element of intelligent consciousness, without which there could be no valid will.

After the most careful investigation and study of the whole record, and giving to the appellees the full benefit of the rule in respect to demurrers to evidence, we are forced to the conclusion that the paper in question is not, in the light of the facts and circumstances disclosed by the record, the true last will of the alleged testator, Richard T. Chappell. We are, therefore, of opinion to reverse and annul the judgment and decree of the court below, to set aside the verdict of the jury, and to remand the cause to said circuit court for a new trial of said issue in accordance with the views expressed in this opinion.

LEWIS, P., and HINTON, J., dissented.

JUDGMENT AND DECREE REVERSED.